## GONZALES, ATTORNEY GENERAL, ET AL. *v.* O CENTRO ESPIRITA BENEFICENTE UNIAO DO VEGETAL ET AL.

No. 04–1084.   Argued November 1, 2005—Decided February 21, 2006

420

ROBERTS, C. J., delivered the opinion of the Court, in which all other Members joined, except ALITO, J., who took no part in the consideration or decision of the case.

*Deputy Solicitor General Kneedler* argued the cause for petitioners. With him on the brief were *Solicitor General Clement, Assistant Attorney General Keisler, Deputy Assistant Attorney General Katsas, Patricia A. Millett, Michael Jay Singer,* and *Matthew M. Collette.*

*Nancy Hollander* argued the cause for respondents. With her on the brief were *John W. Boyd* and *Zachary A. Ives.**

*\*Marci A. Hamilton* filed a brief for the Tort Claimants' Committee et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Baptist Joint Committee et al. by *Gene C. Schaerr, Linda T. Coberly, Thomas C. Berg,* and *Gregory S. Baylor;* for the Council on Spiritual Practices et al. by *David T. Goldberg;* for the United States Conference of Catholic Bishops by *Mark E. Chopko* and *Jeffrey Hunter Moon;* for Dr. John H. Halpern et al. by *Roy S. Haber;* and for Douglas Laycock by *Mr. Laycock, pro se.*

Briefs of *amici curiae* were filed for the International Academy for Freedom of Religion and Belief et al. by *Lee Boothby, Derek Davis, Robert*

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

A religious sect with origins in the Amazon Rainforest receives communion by drinking a sacramental tea, brewed from plants unique to the region, that contains a hallucinogen regulated under the Controlled Substances Act by the Federal Government. The Government concedes that this practice is a sincere exercise of religion, but nonetheless sought to prohibit the small American branch of the sect from engaging in the practice, on the ground that the Controlled Substances Act bars all use of the hallucinogen. The sect sued to block enforcement against it of the ban on the sacramental tea, and moved for a preliminary injunction.

It relied on the Religious Freedom Restoration Act of 1993, which prohibits the Federal Government from substantially burdening a person's exercise of religion, unless the Government "demonstrates that application of the burden to the person" represents the least restrictive means of advancing a compelling interest. 42 U. S. C. §2000bb–1(b). The District Court granted the preliminary injunction, and the Court of Appeals affirmed. We granted the Government's petition for certiorari. Before this Court, the Government's central submission is that it has a compelling interest in the *uniform* application of the Controlled Substances Act, such that no exception to the ban on use of the hallucinogen can be made to accommodate the sect's sincere religious practice. We conclude that the Government has not carried the burden expressly placed on it by Congress in the Religious Freedom Restoration Act, and affirm the grant of the preliminary injunction.

*A. Destro*, and *W. Cole Durham, Jr.;* for the Liberty Legal Institute by *Kelly Shackelford;* for Various Religious and Civil Rights Organizations by *Anthony R. Picarello, Jr.;* and for Robert Gable et al. by *Peter D. Kennedy.*

I

In *Employment Div., Dept. of Human Resources of Ore.* v. *Smith*, 494 U. S. 872 (1990), this Court held that the Free Exercise Clause of the First Amendment does not prohibit governments from burdening religious practices through generally applicable laws. In *Smith*, we rejected a challenge to an Oregon statute that denied unemployment benefits to drug users, including Native Americans engaged in the sacramental use of peyote. *Id.*, at 890. In so doing, we rejected the interpretation of the Free Exercise Clause announced in *Sherbert* v. *Verner*, 374 U. S. 398 (1963), and, in accord with earlier cases, see *Smith*, 494 U. S., at 879–880, 884–885, held that the Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws. *Id.*, at 883–890.

Congress responded by enacting the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, as amended, 42 U. S. C. § 2000bb *et seq.*, which adopts a statutory rule comparable to the constitutional rule rejected in *Smith*. Under RFRA, the Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, "even if the burden results from a rule of general applicability." § 2000bb–1(a). The only exception recognized by the statute requires the Government to satisfy the compelling interest test—to "demonstrat[e] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b). A person whose religious practices are burdened in violation of RFRA "may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief." § 2000bb–1(c).[1]

---

[1] As originally enacted, RFRA applied to States as well as the Federal Government. In *City of Boerne* v. *Flores*, 521 U. S. 507 (1997), we held the application to States to be beyond Congress' legislative authority under § 5 of the Fourteenth Amendment.

The Controlled Substances Act, 84 Stat. 1242, as amended, 21 U. S. C. § 801 *et seq.* (2000 ed. and Supp. I), regulates the importation, manufacture, distribution, and use of psychotropic substances. The Act classifies substances into five schedules based on their potential for abuse, the extent to which they have an accepted medical use, and their safety. See § 812(b) (2000 ed.). Substances listed in Schedule I of the Act are subject to the most comprehensive restrictions, including an outright ban on all importation and use, except pursuant to strictly regulated research projects. See §§ 823, 960(a)(1). The Act authorizes the imposition of a criminal sentence for simple possession of Schedule I substances, see § 844(a), and mandates the imposition of a criminal sentence for possession "with intent to manufacture, distribute, or dispense" such substances, see §§ 841(a), (b).

O Centro Espírita Beneficente União do Vegetal (UDV) is a Christian Spiritist sect based in Brazil, with an American branch of approximately 130 individuals. Central to the UDV's faith is receiving communion through *hoasca* (pronounced "wass-ca"), a sacramental tea made from two plants unique to the Amazon region. One of the plants, *psychotria viridis*, contains dimethyltryptamine (DMT), a hallucinogen whose effects are enhanced by alkaloids from the other plant, *banisteriopsis caapi*. DMT, as well as "any material, compound, mixture, or preparation, which contains any quantity of [DMT]," is listed in Schedule I of the Controlled Substances Act. § 812(c), Schedule I(c).

In 1999, United States Customs inspectors intercepted a shipment to the American UDV containing three drums of *hoasca*. A subsequent investigation revealed that the UDV had received 14 prior shipments of *hoasca*. The inspectors seized the intercepted shipment and threatened the UDV with prosecution.

The UDV filed suit against the Attorney General and other federal law enforcement officials, seeking declaratory and injunctive relief. The complaint alleged, *inter alia*, that applying the Controlled Substances Act to the UDV's sacra-

mental use of *hoasca* violates RFRA. Prior to trial, the UDV moved for a preliminary injunction, so that it could continue to practice its faith pending trial on the merits.

At a hearing on the preliminary injunction, the Government conceded that the challenged application of the Controlled Substances Act would substantially burden a sincere exercise of religion by the UDV. See *O Centro Espirita Beneficiente Uniao do Vegetal* v. *Ashcroft*, 282 F. Supp. 2d 1236, 1252 (NM 2002). The Government argued, however, that this burden did not violate RFRA, because applying the Controlled Substances Act in this case was the least restrictive means of advancing three compelling governmental interests: protecting the health and safety of UDV members, preventing the diversion of *hoasca* from the church to recreational users, and complying with the 1971 United Nations Convention on Psychotropic Substances, a treaty signed by the United States and implemented by the Act. Feb. 21, 1971, [1979–1980] 32 U. S. T. 543, T. I. A. S. No. 9725. See 282 F. Supp. 2d, at 1252–1253.

The District Court heard evidence from both parties on the health risks of *hoasca* and the potential for diversion from the church. The Government presented evidence to the effect that use of *hoasca*, or DMT more generally, can cause psychotic reactions, cardiac irregularities, and adverse drug interactions. The UDV countered by citing studies documenting the safety of its sacramental use of *hoasca* and presenting evidence that minimized the likelihood of the health risks raised by the Government. With respect to diversion, the Government pointed to a general rise in the illicit use of hallucinogens, and cited interest in the illegal use of DMT and *hoasca* in particular; the UDV emphasized the thinness of any market for *hoasca*, the relatively small amounts of the substance imported by the church, and the absence of any diversion problem in the past.

The District Court concluded that the evidence on health risks was "in equipoise," and similarly that the evidence on diversion was "virtually balanced." *Id.*, at 1262, 1266. In

the face of such an even showing, the court reasoned that the Government had failed to demonstrate a compelling interest justifying what it acknowledged was a substantial burden on the UDV's sincere religious exercise. *Id.*, at 1255. The court also rejected the asserted interest in complying with the 1971 Convention on Psychotropic Substances, holding that the Convention does not apply to *hoasca*. *Id.*, at 1266–1269.

The court entered a preliminary injunction prohibiting the Government from enforcing the Controlled Substances Act with respect to the UDV's importation and use of *hoasca*. The injunction requires the church to import the tea pursuant to federal permits, to restrict control over the tea to persons of church authority, and to warn particularly susceptible UDV members of the dangers of *hoasca*. See Preliminary Injunction ¶¶ 2, 5–12, 32–33, App. F to App. to Pet. for Cert. 249a, 250a–252a, 258a–259a. The injunction also provides that "if [the Government] believe[s] that evidence exists that *hoasca* has negatively affected the health of UDV members," or "that a shipment of *hoasca* contain[s] particularly dangerous levels of DMT, [the Government] may apply to the Court for an expedite[d] determination of whether the evidence warrants suspension or revocation of [the UDV's authority to use *hoasca*]." *Id.*, at 257a, ¶ 29.

The Government appealed the preliminary injunction and a panel of the Court of Appeals for the Tenth Circuit affirmed, *O Centro Espirita Beneficiente Uniao do Vegetal* v. *Ashcroft*, 342 F. 3d 1170 (2003), as did a majority of the Circuit sitting en banc, 389 F. 3d 973 (2004). We granted certiorari. 544 U. S. 973 (2005).

## II

Although its briefs contain some discussion of the potential for harm and diversion from the UDV's use of *hoasca*, the Government does not challenge the District Court's factual findings or its conclusion that the evidence submitted on

these issues was evenly balanced. Instead, the Government maintains that such evidentiary equipoise is an insufficient basis for issuing a preliminary injunction against enforcement of the Controlled Substances Act. We review the District Court's legal rulings *de novo* and its ultimate decision to issue the preliminary injunction for abuse of discretion. See *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 867 (2005).

The Government begins by invoking the well-established principle that the party seeking pretrial relief bears the burden of demonstrating a likelihood of success on the merits. See, *e. g., Mazurek* v. *Armstrong*, 520 U. S. 968, 972 (1997) *(per curiam); Doran* v. *Salem Inn, Inc.*, 422 U. S. 922, 931 (1975). The Government argues that the District Court lost sight of this principle in issuing the injunction based on a mere tie in the evidentiary record.

A majority of the en banc Court of Appeals rejected this argument, and so do we. Before the District Court, the Government conceded the UDV's prima facie case under RFRA. See 282 F. Supp. 2d, at 1252 (application of the Controlled Substances Act would (1) substantially burden (2) a sincere (3) religious exercise). The evidence the District Court found to be in equipoise related to two of the compelling interests asserted by the Government, which formed part of the Government's affirmative defense. See 42 U. S. C. § 2000bb–1(b) ("Government may substantially burden a person's exercise of religion only if *it demonstrates* that application of the burden to the person—(1) is in furtherance of a compelling governmental interest . . . " (emphasis added)); § 2000bb–2(3) ("[T]he term 'demonstrates' means meets the burdens of going forward with the evidence and of persuasion"). Accordingly, the UDV effectively demonstrated that its sincere exercise of religion was substantially burdened, and the Government failed to demonstrate that the application of the burden to the UDV would, more likely than not, be justified by the asserted compelling interests.

See 389 F. 3d, at 1009 (Seymour, J., concurring in part and dissenting in part) ("[T]he balance is between actual irreparable harm to [the] plaintiff and potential harm to the government which does not even rise to the level of a preponderance of the evidence").

The Government argues that, although it would bear the burden of demonstrating a compelling interest as part of its affirmative defense at trial on the merits, the UDV should have borne the burden of disproving the asserted compelling interests at the hearing on the preliminary injunction. This argument is foreclosed by our recent decision in *Ashcroft* v. *American Civil Liberties Union*, 542 U. S. 656 (2004). In *Ashcroft*, we affirmed the grant of a preliminary injunction in a case where the Government had failed to show a likelihood of success under the compelling interest test. We reasoned that "[a]s the Government bears the burden of proof on the ultimate question of [the challenged Act's] constitutionality, respondents [the movants] must be deemed likely to prevail unless the Government has shown that respondents' proposed less restrictive alternatives are less effective than [enforcing the Act]." *Id.*, at 666. That logic extends to this case; here the Government failed on the first prong of the compelling interest test, and did not reach the least restrictive means prong, but that can make no difference. The point remains that the burdens at the preliminary injunction stage track the burdens at trial.

The Government attempts to limit the rule announced in *Ashcroft* to content-based restrictions on speech, but the distinction is unavailing. The fact that *Ashcroft* involved such a restriction was the reason the Government had the burden of proof at trial under the First Amendment, see *id.*, at 665, but in no way affected the Court's assessment of the consequences of having that burden for purposes of the preliminary injunction. Here the burden is placed squarely on the Government by RFRA rather than the First Amendment, see 42 U. S. C. §§ 2000bb–1(b), 2000bb–2(3), but the conse-

quences are the same. Congress's express decision to legislate the compelling interest test indicates that RFRA challenges should be adjudicated in the same manner as constitutionally mandated applications of the test, including at the preliminary injunction stage.

## III

The Government's second line of argument rests on the Controlled Substances Act itself. The Government contends that the Act's description of Schedule I substances as having "a high potential for abuse," "no currently accepted medical use in treatment in the United States," and "a lack of accepted safety for use . . . under medical supervision," 21 U. S. C. § 812(b)(1), by itself precludes any consideration of individualized exceptions such as that sought by the UDV. The Government goes on to argue that the regulatory regime established by the Act—a "closed" system that prohibits all use of controlled substances except as authorized by the Act itself, see *Gonzales* v. *Raich*, 545 U. S. 1, 13 (2005)— "cannot function with its necessary rigor and comprehensiveness if subjected to judicial exemptions." Brief for Petitioners 18. According to the Government, there would be no way to cabin religious exceptions once recognized, and "the public will misread" such exceptions as signaling that the substance at issue is not harmful after all. *Id.*, at 23. Under the Government's view, there is no need to assess the particulars of the UDV's use or weigh the impact of an exemption for that specific use, because the Controlled Substances Act serves a compelling purpose and simply admits of no exceptions.

## A

RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach. RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law "to the person"—the particular

claimant whose sincere exercise of religion is being substantially burdened. 42 U. S. C. § 2000bb–1(b). RFRA expressly adopted the compelling interest test "as set forth in *Sherbert* v. *Verner,* 374 U. S. 398 (1963) and *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972)." § 2000bb(b)(1). In each of those cases, this Court looked beyond broadly formulated interests justifying the general applicability of government mandates and scrutinized the asserted harm of granting specific exemptions to particular religious claimants. In *Yoder,* for example, we permitted an exemption for Amish children from a compulsory school attendance law. We recognized that the State had a "paramount" interest in education, but held that "despite its admitted validity in the generality of cases, we must searchingly examine the interests that the State seeks to promote . . . and the impediment to those objectives that would flow from recognizing *the claimed Amish exemption.*" 406 U. S., at 213, 221 (emphasis added). The Court explained that the State needed "to show with more particularity how its admittedly strong interest . . . would be adversely affected by granting an exemption *to the Amish.*" *Id.,* at 236 (emphasis added).

In *Sherbert,* the Court upheld a particular claim to a religious exemption from a state law denying unemployment benefits to those who would not work on Saturdays, but explained that it was not announcing a constitutional right to unemployment benefits for "*all* persons whose religious convictions are the cause of their unemployment." 374 U. S., at 410 (emphasis added). The Court distinguished the case "in which an employee's religious convictions serve to make him a nonproductive member of society." *Ibid.;* see also *Smith,* 494 U. S., at 899 (O'Connor, J., concurring in judgment) (strict scrutiny "at least requires a case-by-case determination of the question, sensitive to the facts of each particular claim"). Outside the Free Exercise area as well, the Court has noted that "[c]ontext matters" in applying the compelling interest test, *Grutter* v. *Bollinger,* 539 U. S. 306, 327 (2003), and has

emphasized that "strict scrutiny *does* take 'relevant differences' into account—indeed, that is its fundamental purpose," *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 228 (1995).

B

Under the more focused inquiry required by RFRA and the compelling interest test, the Government's mere invocation of the general characteristics of Schedule I substances, as set forth in the Controlled Substances Act, cannot carry the day. It is true, of course, that Schedule I substances such as DMT are exceptionally dangerous. See, *e. g., Touby* v. *United States,* 500 U. S. 160, 162 (1991). Nevertheless, there is no indication that Congress, in classifying DMT, considered the harms posed by the particular use at issue here— the circumscribed, sacramental use of *hoasca* by the UDV. The question of the harms from the sacramental use of *hoasca* by the UDV *was* litigated below. Before the District Court found that the Government had not carried its burden of showing a compelling interest in preventing such harms, the court noted that it could not "ignore that the legislative branch of the government elected to place materials containing DMT in Schedule I of the [Act], reflecting findings that substances containing DMT have 'a high potential for abuse,' and 'no currently accepted medical use in treatment in the United States,' and that '[t]here is a lack of accepted safety for use of [DMT] under medical supervision.'" 282 F. Supp. 2d, at 1254. But Congress' determination that DMT should be listed under Schedule I simply does not provide a categorical answer that relieves the Government of the obligation to shoulder its burden under RFRA. This conclusion is reinforced by the Controlled Substances Act itself. The Act contains a provision authorizing the Attorney General to "waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety." 21 U. S. C. § 822(d). The fact that the Act itself contemplates that ex-

empting certain people from its requirements would be "consistent with the public health and safety" indicates that congressional findings with respect to Schedule I substances should not carry the determinative weight, for RFRA purposes, that the Government would ascribe to them.

And in fact an exception has been made to the Schedule I ban for religious use. For the past 35 years, there has been a regulatory exemption for use of peyote—a Schedule I substance—by the Native American Church. See 21 CFR § 1307.31 (2005). In 1994, Congress extended that exemption to all members of every recognized Indian Tribe. See 42 U. S. C. § 1996a(b)(1). Everything the Government says about the DMT in *hoasca*—that, as a Schedule I substance, Congress has determined that it "has a high potential for abuse," "has no currently accepted medical use," and has "a lack of accepted safety for use . . . under medical supervision," 21 U. S. C. § 812(b)(1)—applies in equal measure to the mescaline in peyote,. yet both the Executive and Congress itself have decreed an exception from the Controlled Substances Act for Native American religious use of peyote. If such use is permitted in the face of the congressional findings in § 812(b)(1) for hundreds of thousands of Native Americans practicing their faith, it is difficult to see how those same findings alone can preclude any consideration of a similar exception for the 130 or so American members of the UDV who want to practice theirs. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited'" (quoting *Florida Star* v. *B. J. F.*, 491 U. S. 524, 541–542 (1989) (SCALIA, J., concurring in part and concurring in judgment))).

The Government responds that there is a "unique relationship" between the United States and the Tribes, Brief for Petitioners 27; see *Morton* v. *Mancari*, 417 U. S. 535 (1974),

but never explains what about that "unique" relationship justifies overriding the same congressional findings on which the Government relies in resisting any exception for the UDV's religious use of *hoasca*. In other words, if any Schedule I substance is in fact *always* highly dangerous in any amount no matter how used, what about the unique relationship with the Tribes justifies allowing their use of peyote? Nothing about the unique political status of the Tribes makes their members immune from the health risks the Government asserts accompany any use of a Schedule I substance, nor insulates the Schedule I substance the Tribes use in religious exercise from the alleged risk of diversion.

The Government argues that the existence of a *congressional* exemption for peyote does not indicate that the Controlled Substances Act is amenable to *judicially crafted* exceptions. RFRA, however, plainly contemplates that *courts* would recognize exceptions—that is how the law works. See 42 U. S. C. §2000bb–1(c) ("A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government"). Congress' role in the peyote exemption—and the Executive's, see 21 CFR §1307.31 (2005)—confirms that the findings in the Controlled Substances Act do not preclude exceptions altogether; RFRA makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress.

## C

The well-established peyote exception also fatally undermines the Government's broader contention that the Controlled Substances Act establishes a closed regulatory system that admits of no exceptions under RFRA. The Government argues that the effectiveness of the Controlled Substances Act will be "necessarily . . . undercut" if the Act is not uniformly applied, without regard to burdens on religious exercise. Brief for Petitioners 18. The peyote excep-

tion, however, has been in place since the outset of the Controlled Substances Act, and there is no evidence that it has "undercut" the Government's ability to enforce the ban on peyote use by non-Indians.

The Government points to some pre-*Smith* cases relying on a need for uniformity in rejecting claims for religious exemptions under the Free Exercise Clause, see Brief for Petitioners 16, but those cases strike us as quite different from the present one. Those cases did not embrace the notion that a general interest in uniformity justified a substantial burden on religious exercise; they instead scrutinized the asserted need and explained why the denied exemptions could not be accommodated. In *United States* v. *Lee*, 455 U. S. 252 (1982), for example, the Court rejected a claimed exception to the obligation to pay Social Security taxes, noting that "mandatory participation is indispensable to the fiscal vitality of the social security system" and that the "tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief." *Id.*, at 258, 260. See also *Hernandez* v. *Commissioner*, 490 U. S. 680, 700 (1989) (same). In *Braunfeld* v. *Brown*, 366 U. S. 599 (1961) (plurality opinion), the Court denied a claimed exception to Sunday closing laws, in part because allowing such exceptions "might well provide [the claimants] with an economic advantage over their competitors who must remain closed on that day." *Id.*, at 608–609. The whole point of a "uniform day of rest for all workers" would have been defeated by exceptions. See *Sherbert*, 374 U. S., at 408 (discussing *Braunfeld*). These cases show that the Government can demonstrate a compelling interest in uniform application of a particular program by offering evidence that granting the requested religious accommodations would seriously compromise its ability to administer the program.

Here the Government's argument for uniformity is different; it rests not so much on the particular statutory program at issue as on slippery-slope concerns that could be invoked

in response to any RFRA claim for an exception to a generally applicable law. The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions. But RFRA operates by mandating consideration, under the compelling interest test, of exceptions to "rule[s] of general applicability." 42 U. S. C. § 2000bb–1(a). Congress determined that the legislated test "is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." § 2000bb(a)(5). This determination finds support in our cases; in *Sherbert,* for example, we rejected a slippery-slope argument similar to the one offered in this case, dismissing as "no more than a possibility" the State's speculation "that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work" would drain the unemployment benefits fund. 374 U. S., at 407.

We reaffirmed just last Term the feasibility of case-by-case consideration of religious exemptions to generally applicable rules. In *Cutter* v. *Wilkinson,* 544 U. S. 709 (2005), we held that the Religious Land Use and Institutionalized Persons Act of 2000, which allows federal and state prisoners to seek religious accommodations pursuant to the same standard as set forth in RFRA, does not violate the Establishment Clause. We had "no cause to believe" that the compelling interest test "would not be applied in an appropriately balanced way" to specific claims for exemptions as they arose. *Id.,* at 722. Nothing in our opinion suggested that courts were not up to the task.

We do not doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA. But it would have been surprising to find that this was such a case, given the longstanding exemption from the Controlled Substances Act for religious use of peyote, and the fact that the very reason Congress enacted RFRA was to respond to a decision

denying a claimed right to sacramental use of a controlled substance. See 42 U. S. C. § 2000bb(a)(4). And in fact the Government has not offered evidence demonstrating that granting the UDV an exemption would cause the kind of administrative harm recognized as a compelling interest in *Lee, Hernandez,* and *Braunfeld.* The Government failed to convince the District Court at the preliminary injunction hearing that health or diversion concerns provide a compelling interest in banning the UDV's sacramental use of *hoasca.* It cannot compensate for that failure now with the bold argument that there can be no RFRA exceptions at all to the Controlled Substances Act. See Tr. of Oral Arg. 17 (Deputy Solicitor General statement that exception could not be made even for "rigorously policed" use of "one drop" of substance "once a year").

## IV

Before the District Court, the Government also asserted an interest in compliance with the 1971 United Nations Convention on Psychotropic Substances, Feb. 21, 1971, [1979–1980] 32 U. S. T. 543, T. I. A. S. No. 9725. The Convention, signed by the United States and implemented by the Controlled Substances Act, calls on signatories to prohibit the use of hallucinogens, including DMT. The Government argues that it has a compelling interest in meeting its international obligations by complying with the Convention.

The District Court rejected this interest because it found that the Convention does not cover *hoasca.* The court relied on the official commentary to the Convention, which notes that "Schedule I [of the Convention] does not list . . . natural hallucinogenic materials," and that "[p]lants as such are not, and—it is submitted—are also not likely to be, listed in Schedule I, but only some products obtained from plants." U. N. Commentary on the Convention on Psychotropic Substances 387, 385 (1976). The court reasoned that *hoasca,* like the plants from which the tea is made, is sufficiently distinct from DMT itself to fall outside the treaty. See 282 F. Supp. 2d, at 1266–1269.

We do not agree. The Convention provides that "a preparation is subject to the same measures of control as the psychotropic substance which it contains," and defines "preparation" as "any solution or mixture, in whatever physical state, containing one or more psychotropic substances." See 32 U. S. T., at 546, Art. 1(f)(i); *id.*, at 551, Art. 3. *Hoasca* is a "solution or mixture" containing DMT; the fact that it is made by the simple process of brewing plants in water, as opposed to some more advanced method, does not change that. To the extent the commentary suggests plants themselves are not covered by the Convention, that is of no moment—the UDV seeks to import and use a tea brewed from plants, not the plants themselves, and the tea plainly qualifies as a "preparation" under the Convention.

The fact that *hoasca* is covered by the Convention, however, does not automatically mean that the Government has demonstrated a compelling interest in applying the Controlled Substances Act, which implements the Convention, to the UDV's sacramental use of the tea. At the present stage, it suffices to observe that the Government did not even *submit* evidence addressing the international consequences of granting an exemption for the UDV. The Government simply submitted two affidavits by State Department officials attesting to the general importance of honoring international obligations and of maintaining the leadership position of the United States in the international war on drugs. See Declaration of Gary T. Sheridan (Jan. 24, 2001), App. G to App. to Pet. for Cert. 261a; Declaration of Robert E. Dalton (Jan. 24, 2001), App. H, *id.*, at 265a. We do not doubt the validity of these interests, any more than we doubt the general interest in promoting public health and safety by enforcing the Controlled Substances Act, but under RFRA invocation of such general interests, standing alone, is not enough.[2]

---

[2] In light of the foregoing, we do not reach the UDV's argument that Art. 22, ¶ 5, of the Convention should be read to accommodate exceptions under domestic laws such as RFRA.

* * *

The Government repeatedly invokes Congress' findings and purposes underlying the Controlled Substances Act, but Congress had a reason for enacting RFRA, too. Congress recognized that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise," and legislated "the compelling interest test" as the means for the courts to "strik[e] sensible balances between religious liberty and competing prior governmental interests." 42 U. S. C. §§ 2000bb(a)(2), (5).

We have no cause to pretend that the task assigned by Congress to the courts under RFRA is an easy one. Indeed, the very sort of difficulties highlighted by the Government here were cited by this Court in deciding that the approach later mandated by Congress under RFRA was not required as a matter of constitutional law under the Free Exercise Clause. See *Smith,* 494 U. S., at 885–890. But Congress has determined that courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue. Applying that test, we conclude that the courts below did not err in determining that the Government failed to demonstrate, at the preliminary injunction stage, a compelling interest in barring the UDV's sacramental use of *hoasca.*

The judgment of the United States Court of Appeals for the Tenth Circuit is affirmed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.