UNITED STATES of America, Plaintiff,

v.

Samuel A. GIROD, Defendant.

No. 5:15–CR–87–DCR–REW–1

United States District Court, E.D. Kentucky, Central Division. Lexington.

Signed December 30, 2015

Kate K. Smith, AUSA, U.S. Attorney's Office, Lexington, KY, for Plaintiff.

## ORDER

Robert E. Wier, United States Magistrate Judge

The Court assesses whether Defendant Samuel Girod must, as part of full "processing" by the United States Marshals Service, submit to being photographed. Girod faces several charges centering on allegedly selling misbranded drugs in violation of the Food, Drug, and Cosmetic Act. *See* DE #1 (Indictment). The Indictment further asserts that Girod intimidated FDA investigators and obstructed justice. *Id.* (Counts 1, 2, 12). His trial is set for April 2016. *See* DE #25 (Order).

The United States secured the Indictment on October 1, 2015 and then sought a summons for Girod. Girod appeared as directed; indeed, the Court reset the hearing once by order at counsel's request, and Defendant duly attended on the new date. The United States did not seek detention, and the Court released Girod on fairly light terms, although he is under USPO supervision. DE #12 (Release Conditions). Though the Court never placed Girod into formal custody, the release order, as is standard, ordered release to occur "after processing." *Id.* at 3 (directing United States Marshal: "The defendant is ORDERED released after processing.").

Immediately after the initial appearance, defense counsel (with the responsible AUSA notified and present) approached the Court in Chambers and objected to the Marshal photographing Girod as part of processing. *See* DE #11 (Minute Entry). Girod is Amish and raised a religious objection to participating in photography. *Id.* To preserve the status quo, the Court stayed that part of processing pending motion practice. *Id.* The parties timely filed their papers. *See* DE ## 14 (Girod Motion); 16 (United States Response); 19 (Girod Reply). The Court determined a

hearing necessary under the rubric of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb, et seq. The hearing occurred, and the Court has carefully considered the full record.

The United States offers quite rational reasons for seeking to photograph each defendant the Marshal processes. As to the full run of federal criminal defendants, it is wholly legitimate for the Marshal to create a photographic identification record to hedge against fugitive status and/or to solidify the efficacy of pre-trial monitoring. However, in this unique [1] context—where a defendant shows that posing for a photograph would substantially burden, indeed directly contravene, a sincere exercise of religion–the Government's requisite justification, created by Congress in RFRA, is much higher and here unmet. The Court finds that the United States has not proven that requiring Girod to pose for standard Marshal photography would further a compelling government interest. Additionally, the particular processing sought is not the least restrictive means for serving the interests the Government touts. As such, RFRA exempts Girod from standard photographic processing in this context.[2]

Girod's motion is phrased as one to enjoin the Marshal. However, as stated at the hearing, the question really is whether the Court will require or allow full processing, photography included, as part of the release conditions. Because the Court finds an exemption from full processing required, the Court **GRANTS** Girod's motion (DE # 14) insofar as it seeks that exemption. The Marshal's authority, in this context, derives from the Court's release order.[3] This ruling thus requires no injunction. The Court **ORDERS** that the Marshal's processing of Girod is complete, at this stage, and the Court does not require Girod to pose for photographs by the United States Marshals Service.

## 1. RFRA re-imposed (mostly) pre-Smith free exercise analysis

The parties essentially agree on the analytical path to be followed. Congress responded to the Supreme Court's decision in *Employment Div. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), by passing RFRA, a statute designed to "provide broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, —— U.S. ——, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014). *Smith* had "largely repudiated" the balancing test used in cases such as *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15

---

1. In the undersigned's 9+ years of service, which have involved the initial appearance and thus USMS processing of thousands of defendants, this is the first such objection encountered. The supervising Marshal, who testified, also has never before faced this objection.

2. Girod is pre-trial. Should he be convicted, the calculus may change. That issue is not before the Court.

3. The defense makes much of whether the Marshal ever has authority to photograph a defendant released at a Rule 5 hearing that appeared on a summons or self-reported. The USMS policy certainly and unsurprisingly focuses linguistically on "prisoners" or "arrestees." However, the policy also plainly indicates that the USMS should request and pursue full processing for all defendants, directing that the Marshal, as to a summoned or self-reporting individual, "request[] that the court order the defendant to appear in the USMS office for processing." Ex. 1, Cellblock Operations 9.20, at D.2.e.3.e. The Court ordered processing here, modifying the scope upon learning of the religious objection. The Court notes that some level of USMS processing almost always must occur to meet, e.g., DNA collection requirements imposed by statute. *See* 42 U.S.C. § 14135a(a)(1)(A); 28 C.F.R. § 28.12(b).

(1972) when addressing free-exercise claims. *Burwell,* 134 S.Ct. at 2760. *Smith* rejected the notion of heightened First Amendment scrutiny for a neutral, generally applicable law that burdened religious practices. Congress "responded to Smith by enacting RFRA." *Burwell,* 134 S.Ct. at 2761. As the Supreme Court summarized:

> "[L]aws [that are] 'neutral' toward religion," Congress found, "may burden religious exercise as surely as laws intended to interfere with religious exercise." 42 U.S.C. § 2000bb(a)(2); see also § 2000bb(a)(4). In order to ensure broad protection for religious liberty, RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." § 2000bb–1(a). If the Government substantially burdens a person's exercise of religion, under the Act that person is entitled to an exemption from the rule unless the Government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b).

> . . .

> Following our decision in *City of Boerne,* Congress passed the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc *et seq.* That statute, enacted under Congress's Commerce and Spending Clause powers, imposes the same general test as RFRA but on a more limited category of governmental actions. See *Cutter v. Wilkinson,* 544 U.S. 709, 715–716, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). And, what is most

relevant for present purposes, RLUIPA amended RFRA's definition of the "exercise of religion." See § 2000bb–2(4) (importing RLUIPA definition). Before RLUIPA, RFRA's definition made reference to the First Amendment. See § 2000bb–2(4) (1994 ed.) (defining "exercise of religion" as "the exercise of religion under the First Amendment"). In RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment and defined the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A). And Congress mandated that this concept "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc–3(g).

*Burwell,* 134 S.Ct. at 2761–62 (footnotes omitted).

The person objecting faces the initial threshold of establishing that particular governmental action [4] would "substantially burden a person's exercise of religion." *See Weinberger v. Grimes,* No. 07–6461, 2009 WL 331632, at *5 (6th Cir. Feb 10, 2009); *Davila v. Gladden,* 777 F.3d 1198, 1204 (11th Cir.2015). The Court advisedly cabins its inquiry. The theological legitimacy of a particular religious practice, a matter of faith and not of legal proofs, is not in question under RFRA. *Burwell,* 134 S.Ct. at 2778 (describing question of reasonableness of religious belief one "that the federal courts have no business addressing"). Rather, the Court simply assesses an objector's *sincerity* of belief. *See Bible Believers v. Wayne County, Mich.,* 805 F.3d 228, 256 (6th Cir.

---

4. The statute applies to "all Federal law, and implementation of that law, whether statutory or otherwise." 42 U.S.C. § 2000bb–3(a).

2015) (citing *Fowler v. Rhode Island,* 345 U.S. 67, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953) ("[I]t is no business of courts to say that what is a religious practice or activity for one group is not religion under the protection of the First Amendment.")) An exercise of religion, if honestly professed by an adherent, receives protection against a substantial governmental burden not adequately justified. As to the issue of substantial burden,[5] the Court applies *Sherbert* and *Yoder* principles to assess the degree of impact on religious exercise from the governmental action involved. This case does not require marginal definition, because if a governmental action coerces a direct violation of religious tenets, the burden of the action would be substantial. *See, e.g., Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1069–70 (9th Cir. 2008) (defining as "substantial burden" when individuals are "coerced to act contrary to their religious beliefs by threat of civil or criminal sanctions"); *Korte v. Sebelius,* 735 F.3d 654, 682 (7th Cir.2013) ("At a minimum, a substantial burden exists when the government compels a religious person to 'perform acts undeniably at odds with fundamental tenets of his religious beliefs.'") (quoting *Yoder*); *Yoder,* 92 S.Ct. at 1534 (noting burden as "inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs"); *Little Sisters of*

the *Poor Home for the Aged, Denver, Colo. v. Burwell,* 794 F.3d 1151, 1176–77 (10th Cir.) *cert. granted sub nom. S. Nazarene Univ. v. Burwell,* —— U.S. ——, 136 S.Ct. 445, 193 L.Ed.2d 346 (2015) and *cert. granted in part sub nom. Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Burwell,* —— U.S. ——, 136 S.Ct. 446, 193 L.Ed.2d 346 (2015) ("Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief. In determining whether a law or policy applies substantial pressure on a claimant to violate his or her beliefs, we consider how the law or policy being challenged actually operates and affects religious exercise." (citation and internal quotation marks omitted)).

■■■■ If the person objecting shows that governmental action would substantially burden that person's exercise of religion, the Government then must demonstrate[6] that "application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1(b). The test is one of "strict scrutiny" and invokes, in substantial part,[7] the pre-*Smith* constitutional rubric. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 126 S.Ct. 1211, 1220–21, 163 L.Ed.2d 1017 (2006). Critically, the Government's showing must

---

5. The Court notes that substantiality is an objective inquiry and a question of law. *Catholic Health Care Sys. v. Burwell,* 796 F.3d 207, 217 (2d Cir.2015) ("Although a court accepts a litigant's sincerely held religious beliefs, it must assess the nature of a claimed burden on religious exercise to determine whether, as an objective legal matter, that burden is "substantial" under RFRA.").

6. Meaning, "meet[] the burdens of going forward with the evidence and of persuasion." § 2000bb–2(3).

7. The second tier—that the means used be the least restrictive alternative—is a creation of RFRA. *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2171, 138 L.Ed.2d 624 (1997) (noting, "the Act imposes in every case a least restrictive means requirement—a requirement that was not used in the pre-Smith jurisprudence RFRA purported to codify").

focus on justification as to the particular person burdened. Thus, "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Id.* The second requirement, that the means of regulation be the least restrictive available to further the governmental interest, is an independent, rigorous hurdle. "The least-restrictive-means standard is exceptionally demanding." *Burwell,* 134 S.Ct. at 2780. The Supreme Court has categorized the dual justificatory burdens imposed on the Government by RFRA, "the most demanding test known to constitutional law." *City of Boerne,* 117 S.Ct. at 2171.[8]

## 2. The hearing

The Court allowed both sides a full and fair hearing. Defendant Girod testified. Deputy United States Marshal Jeffery Kelly and United States Probation Officer Kristen O'Brien testified. The Court has carefully evaluated the record.

■ Girod's position, that posing[9] for photographs would violate his religious principles, undoubtedly is a sincere one. Girod testified to a biblical basis for the belief, centered on the proscription against "graven images" set forth in the Second Commandment.[10] Indeed, the witness cited to multiple passages within the Bible, and to his related Amish tradition, that he deems to proscribe knowing participation in photography. He described a life-long avoidance of photography and affirmatively stated that he has never posed for a photograph, has no photographs in his home, and has no photographs of his children. Girod described his unswerving refusal to consent to photographs when approached in public. He also discussed the likely negative Amish community reaction to any posed photograph. He declared a fundamental religious opposition to any re-

**8.** In *Sherbert,* the Supreme Court defined a "compelling interest," stating: "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '(o)nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation." 83 S.Ct. at 1795 (quoting *Thomas v. Collins,* 323 U.S. 516, 65 S.Ct. 315, 323, 89 L.Ed. 430 (1945)). The least restrictive means tier "is a severe form of the 'narrowly tailored' test." *McAllen Grace Brethren Church v. Salazar,* 764 F.3d 465, 475 (5th Cir.2014) (citing *Sherbert,* 83 S.Ct. at 1796 ("[E]ven if the possibility of spurious claims did threaten to dilute the fund and to disrupt the scheduling of work, it would plainly be incumbent upon [the Government] ... to demonstrate that *no alternative forms of regulation would combat such abuses without infringing First Amendment rights."*) (emphasis added) and *Yoder,* 92 S.Ct. at 1533 ("The essence of all that has been said and written on the subject is that only those interests of the highest order and those *not otherwise served* can overbalance legitimate claims to the free exercise of religion.") (emphasis added)).

**9.** Posing is the word Girod used repeatedly (at least 9 times) during testimony. He said "I don't pose," and "I've never posed for a picture." Though he stated he would not "like" being captured on a candid photo or institutional video, he distinguished a situation where he knowingly posed from one where his image was captured unknowingly and without his involvement. His lawyer sharply drew the same distinction in discussing possible alternatives to posed photography. *See, e.g.,* DE # 14 (Girod Brief) at 8 ("[U]sing a picture from the [courthouse] video camera would not require Girod to submit to a photograph. Thus, it would not offend his deeply held belief.").

**10.** In the King James Version, which employs the translation "graven image," Exodus 20:4 states, "Thou shalt not make unto thee any graven image, or any likeness of any thing that is in heaven above, or that is in the earth beneath, or that is in the water under the earth."

quirement that he submit to the posed photography proposed by and typically required by the USMS as part of processing. The United States did not contest the sincerity of Girod's position. The Court finds the position honestly held. Additionally, because compelling Girod to pose for processing would compel him to directly violate his authentic beliefs, that act would substantially burden Girod's professed exercise of religion.

The United States supported its posture through DUSM Kelly and USPO O'Brien; both of whom are credible witnesses.

Kelly, a DUSM and acting supervisor in Lexington, described Marshal processing and the photograph requirement. He depicted a uniform policy centered on the need for quick and clear identification of arrestees, detainees, and those facing federal charges but on bond. He described in detail the Marshals' Cellblock Operations policy, which is a hearing exhibit.

Per Kelly, processing involves recordation of full biographical and identifying information. This includes taking a narrative record of physical appearance, noting any and all distinguishing marks, and taking front and side facial photographs as well as pictures of scars, tattoos, etc. Fingerprinting also occurs. The Marshal described the need for photographs within the USMS computer system (including the agency's transport role) as well as more broadly within the BOP. He talked extensively of the need for an available photograph to aid in acquisition of any fugitive.

Marshal Kelly also testified in detail about the video monitoring system for the Courthouse in Lexington. Per Kelly, there are external and internal cameras. The external cameras cover multiple views and angles and have a zoom capability. Kelly believes the system retains data for about 30 days. Kelly testified that one purpose of the external system is to identify persons outside the building in the event of damage to the exterior. He knew less about the internal system, although he did describe the camera located around the magnetometer at the public entry—that camera directly focuses on individuals entering the courthouse. Kelly testified that neither system allows for electronic capture of an image from the video feed. Indeed, he stated that, to his knowledge, the video cannot be saved or preserved and is auto-erased after a temporary period. The witness did take a representative photo of the entry monitor with his iPhone and display the photo in Court.[11] According to Kelly, this method, producing what he called an "unreadable" image, is the only means of capturing an image from the Courthouse surveillance system. Kelly professed to know little about the building's internal camera operations. For instance, he could not describe the camera

---

11. The iPhone photo generated much discussion. First Girod objected, but upon viewing the depiction in open court, withdrew the objection. The Court allowed all parties to assess the utility of the display. The Court makes a few observations. The photo is of the security monitor (as caught on a particular device) and certainly does not have the clarity of an original picture (or likely a digital copy of an original image). Nonetheless, the photo surely is far superior to, e.g., a sketch, which is something Kelly agreed could be reliable as a mechanism for finding a fugitive. The Court easily recognized the exemplar as depicting one of the building's CSOs.

Documenting the exhibit proved something of a challenge. Ultimately, the United States tendered the photo on a disk, with the image transferred directly from DUSM Kelly's phone onto the disk. DE # 29. The Court finds that the image as presented fairly captures the image displayed in open court. It is not the identical presentation, because the presentation itself was on the witness's iPhone. Despite that, the digital copy duly represents the substance of the image for purposes of the record. The manner of display was useful and probative, in context, and the record fairly shows the same image though in a different medium.

system within the courtroom. A camera is easily observable in the courtroom (specifically, Courtroom B), but the United States had no proof about the functionality of that camera system.

Kelly denied on cross that the cameras, internal or external, have the clarity needed for fine identification (such as of scars or close characteristics). On questioning from the Court, Kelly stated that Marshals in the field use their iPhones to take any needed pictures. He agreed that the iPhone takes a useful image but denied that the iPhone is compatible with the USMS computer system, the system that stores and transmits processing photos.

Officer O'Brien generally testified that there is some utility or need in having a photo of a defendant on bond. A USPO might not have met the releasee previously or might be covering for another officer. In that circumstance, which she did not relate to Girod, an officer might need to consult a photo. Importantly, on questioning from the Court, O'Brien characterized Girod as a low risk of flight and a low risk of danger. She stated that, over 6 weeks of release, the USPO knew of and alleged no problems by Girod with respect to his bond compliance.

In argument, the United States propounded two compelling governmental interests—fugitive apprehension and the need for effective monitoring of bond conditions.[12] In discussing risks of flight or

noncompliance, the prosecutor cited the charges in the Indictment, including the assertion that Girod violated federal court restrictions in Missouri (per ¶¶ 14–16). He also has ties in other jurisdictions. This creates, per the prosecution, the "very real possibility" of flight. The Government also cited the generic need for USPO to have access to a photo to assure effective monitoring of conditions.

The defense chided the Government for conclusory or speculative concerns. Per counsel, there is no compelling interest as to Girod, and the USMS can serve any related interest through court video and/or photos/videos taken, without Girod's witting participation, when Girod attends court.

*3. RFRA exempts Girod, in this context.*

■■■■ The Court stresses the particularized analysis called for by RFRA. Thus, the statute requires that the Court not evaluate the general legitimacy of a stated governmental interest; rather, the Court must judge whether, as to Samuel Girod, the United States has proven a compelling interest servable only by the manner of USMS photography sought. RFRA's focus on "the person" at issue requires an assessment "beyond broadly formulated interests" and searching scrutiny of "the asserted harm of granting specific exemptions to particular religious claimants." *Gonzales,* 126 S.Ct. at 1220. The generic identification goals[13] and

**12.** In briefing, the United States cited these dual safety concerns (pursuit of fugitives and ensuring proper supervision by USPO) as "more compelling than the defendant's First Amendment rights." DE # 16, at 5. That may well be correct, in light of *Smith.* However, RFRA creates a sphere of protection for religious liberty independent of and obviously greater than the First Amendment. *Burwell* called RFRA (as amended by RLUIPA), an intentional "complete separation from First Amendment case law." *Burwell,* 134 S.Ct. at 2762.

**13.** The Court notes that the USMS does not include photography (or even fingerprinting) in initial processing of most juveniles. *See* Exhibit 1 at D.5.d. The parties did not discuss this at the hearing, but the operational policy restricts processing as to that category, absent a court order. This simply tells the Court that there are rare and limited circumstances, involving countervailing interests, where the USMS can dispense with full processing.

broad catalysts for them undoubtedly are sound, but RFRA demands significantly more in the context of a personal religious objection.

There is precious little in this record that suggests, much less proves, that Girod presents the risks and concerns cited by the United States. As to the potentiality for Girod to flee, the Court notes the following factors [14]:

a. Girod appeared when summoned, including when the Court reset the initial appearance by order. He also timely contacted the USPO and participated in the bond interview process. (The interview occurred October 23, per the PSR; the initial appearance was on November 2). He appeared in Lexington for the USPO interview.

b. Girod appeared at the hearing regarding the current motion.

c. Girod has deep ties to the District, including a farm-centered residence of over 9 years in Bath County. His family and livelihood depend on operation of the farm, on which Girod has some revolving and other debt. Defendant exclusively is a farmer, with no indications of significant liquid assets.

d. Girod has 12 children with his wife of 34 years. Ten of the 12 live in Owingsville, Bath County, Kentucky.

e. Girod is in good health and stable, mentally and physically.

f. Girod, age 56, has utterly no criminal record and obviously no record of nonappearance.

g. The USPO cited, in its assessment, "no known factors indicating ... risk of danger" and determined no "risk of nonappearance." The USPO recommended release on "Personal Recognizance with no supervision."

The stated governmental interest centering on pretrial supervision also is low. Certainly, the USPO fully interviewed and is actively supervising Girod. He is known to the office and presented no issues of noncompliance in the period between initial appearance and the hearing. Again, the factors related to absence of flight risk also favorably indicate low risk as to danger or noncompliance with bond. That was true at release, and the bond compliance period strenthens the view.

The United States did cite to the particulars in the Indictment, to Girod's ties in other states (Missouri and Indiana), and to the *possible* need for identification. Though the need for photographs has a rational tether, the link is not here compelling. The law presumes Girod innocent, and the Indictment raises only probable cause as to (mostly) dated conduct. As such, the Count-based concerns over obstruction or obstinacy toward a different court's orders, while certainly reasonable, are not forceful inferences. There is an argument for some risk attendant to every defendant indicted on felony charges, but Girod's situation carries only that organic risk under the charging document. Nothing about Girod's personal circumstances contributes to any negative view of his willingness to appear and to abide by pretrial limits.

Exempting Girod, the person affected, thus creates very low "asserted harm," *Gonzales,* 126 S.Ct. at 1221, and the "marginal interest," *Burwell,* 134 S.Ct. at 2779, in enforcing the Marshals' uniform processing pattern, as to Girod, is low. This conclusion intensifies given the identifying

---

14. Some of these come from the Pretrial Services Report, which the USPO circulated to the parties in advance of the initial appearance and thus is part of the record before the Court informing release conditions.

information the Government undoubtedly possesses. Thus, Girod did submit to full processing, excepting only the photographs. The USMS obtained complete identifying and biographical information and secured Girod's fingerprints. Further, USMS and USPO personnel now have had multiple interactions with Girod, in person, in court (with all cameras presumably rolling), and at the USPO. The United States has a significant trove of information useful in identifying Girod, if necessary.

■ Relatedly, and as to the interests presented,[15] the manner of photography sought is not the least restrictive means of furthering such interests. This "exceptionally demanding" standard, *Burwell*, 134 S.Ct. at 2780, begs for the Government to show a degree of situational flexibility, creativity, and accommodation when putative interests clash with religious exercise.

■ Girod has appeared at the courthouse on several occasions, where surveillance systems controlled or available to the USMS have undoubtedly capture Girod's images. The hearing indicated that the cameras offer a wide range of possible views, including one directly capturing public entry into the courthouse. If the cameras' or systems' technical limits present obstacles to making, keeping, or preserving an adequate image, the Marshal may need to augment or improve its technical capabilities when faced with this rare objection. A valid religious objection may prompt the need for additional costs as a matter of accommodation. *See Burwell*, 134 S.Ct. at 2781 ("[B]oth RFRA and its

sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs."). There is no proof here, either way, on costs, but the ubiquity of filming and digital cameras in this society anecdotally says options readily exist to easily capture transmissible digital images.

Further, the hearing showed that the USMS already regularly and effectively uses iPhones in the field to take photographs. Given that access and technical facility, and given Girod's multiple trips to and from court, the USMS could capture (and could have captured) Girod's image in a manner that would effectively permit identification. DUSM Kelly did not process Girod and had no information on any scars or other unique identifiers the Marshal typically would photograph; as such, per this record, a picture of Girod's face alone would duplicate the product of typical processing, and the USMS could accomplish that through candid filming and/or photography. Such activity, per Girod and his counsel, would not implicate the objection before the Court. In argument, defense counsel confirmed that the key is that Girod not wittingly pose for an image. The USMS cannot simply object that an iPhone would not interface with its digital system. The point is whether the Government could secure the identifying information it touts in ways less restrictive than forcing Girod to pose. The Court finds that there are other available means.[16]

---

**15.** If the governmental interest is compelling, the means to further that interest must be the least restrictive. Here, the interests propounded are not compelling, but the Court alternatively analyzes the means employed.

**16.** And again, the Court also must consider the other identifying information (personal

contact, the processing interview, fingerprints, prior video) already available to augment any candid images. In the Court's view, even if the best the United States could do—which is not the case—would be the photo of the entry monitor, that alone would, in context and in combination with other data, permit identification of Girod.

If this case centered on rational basis review, the Court likely would require that Girod submit to the Marshals' processing like everyone else encountering a neutral, generally applied law or policy. Congress elected to revivify a more searching inquiry when a conflict exists between authentic religious exercise and governmental act. To prevent an exemption, the United States must prove, as to the potentially exempt objector, a compelling interest furtherable only by the offending means. The Government has failed in that burden in this particular case, at this particular stage, and the Court thus exempts Samuel Girod from the normal requirement to pose for photographs as part of USMS processing.[17]

Either party may appeal this pre-trial decision, which does not dispose of a charge or defense in the case, per the mechanics and standards of Rule 59(a). To the extent the decision is one managing release conditions, 18 U.S.C. § 3145 would also supply a review or appeal avenue and potentially affect the standard.

---

**17.** *United States v. Slabaugh*, 852 F.2d 1081 (8th Cir.1988), like most cases in a fact-specific inquiry, is only of passing use. Certainly, the Court expects the arguments and justifications to change if and when Girod is at a stage parallel to the defendant in *Slabaugh*. Further, Girod is correct that, because *Slabaugh* was a First Amendment case and pre-RFRA, the analytical transference may face obstacles. Slabaugh's individual circumstances differed significantly from those of Girod; Slabaugh was a convicted felon, was placed on active probation, and had admitted to an improper sexual advance against a teenager. *United States v. Slabaugh*, 655 F.Supp. 462, 471 (D.Minn.1987). *Slabaugh* has some appeal just because of the Amish and photograph parallels, but *Slabaugh* decides this dispute for neither side.