MAIN, Justice.
Monte Sano Research Corporation (“MSRC”), Steven L. Thornton, and Steven B. Teague appeal from a preliminary injunction entered by the Madison Circuit Court against them in an action brought by Kratos Defense & Security Solutions, Inc., a California-based aerospace and defense contractor (“Kratos Defense”); Digital Fusion, Inc. (“DFI”), an Alabama-based holding company, and Digital Fusion Solutions, Inc. (“DFSI”), a Florida corporation and a subsidiary of DFI (hereinafter referred to collectively as “Kratos”),[1] alleging breach of the duty of loyalty, breach of contract, tortious interference with business and contractual relationships, and civil conspiracy. Additionally, Kratos sought injunctive relief.
MSRC was formed in 2009 to procure government subcontract work at Redstone Arsenal in Huntsville. Thornton and Teague were employees of DFI, which also engaged in government subcontract work; they became employees of Kratos when Kratos Defense merged with DFI in 2008. Kratos terminated Teague’s employment on June 23, 2011. Thornton resigned from Kratos four days later.
An explanation of the nature of government contract work is essential to an understanding of this case. The United States Army awards government contracts to service providers at Redstone Arsenal in Huntsville under what is referred to as an AMCOM Express contract.[2] Pursuant to the AMCOM Express contract, entities compete within a “domain” for an award of multi-year blanket purchase agreements (“BPAs”) from the Army. There are four separately recognized contracting domains: (1) logistics; (2) programmatic; (3) technical; and (4) business and analytical. Those entities that are awarded BPAs are referred to by the Army as “prime contractors.”
Before competing for a BPA award, a prospective prime contractor assembles a BPA team, a group that -will be available to assist it in performing specific work as *858 signments. A BPA team includes the prospective prime contractor and its employees, subcontractors and employees of the subcontractors, and other team members. The BPA team members, including subcontractors and their employees, would be qualified in the specific domain related to the specific work assignment for which the team is competing.
An award of a BPA, however, does not guarantee that a prime contractor will receive contractual work assignments in the future. Rather, a BPA entitles a holder to bid competitively against other prime contractors for awards of specific work assignments known as “task orders.” In soliciting task-order-proposal information from prime contractors, the Army releases a task-order request for quote (“TORFQ”). In turn, prime contractors can send the TORFQ to their BPA team members to solicit information for a team response. After evaluating submitted proposals, the Army awards a task order directly to a prime contractor. The task order includes a “statement of work” or an assignment, a technical description from the Army explaining the work to be performed. Often, the task order will also be accompanied by one or more “technical instructions,” a subset of a task order, that addresses a particular area of work and specifies how the Army wants the prime contractor to perform it. Technical instructions that may more closely reflect new information or changed priorities are usually issued after a task order is awarded. The prime contractor places BPA team members alongside “technical monitors,” government personnel who monitor the progress and the performance of government contracts, to perform the assigned work. The subcontractor or team member is paid for its time on the specific task through the prime contractor.
The technical monitors seek input from subcontractors and other team members working in their areas. They solicit from task-team members a rough order of magnitude (“ROM”). A ROM, which is similar to a budget, provides the technical monitor an allocation of specific labor categories, hours necessary to complete the task, and rates.
In 2005, the Army awarded Computer Science Corporation (“CSC”), a BPA within the technical domain, but not within the logistics, programmatic, or business and analytical domain. Kratos Defense was part of CSC’s BPA team and appeared to perform work only in the technical domain. The Army awarded CSC its first task order, task order 10, pursuant to the BPA in September 2005. Under task order 10, Kratos Defense obtained work assignments over the next five years, during which what the parties describe as a “merger” of Kratos Defense and DFI occurred.[3] Kratos Defense received subsequent task orders under CSC’s BPA.
Also in 2005, DFI, which contracted with prime contractors to provide technical, scientific, and engineering support to the Army and which later merged with Kratos Defense, employed Thornton, who served as vice president of engineering development, and Teague, who was employed as director of weapons development and integration. Thornton supervised approximately 50 employees and oversaw approximately $9 million in revenue. Teague supervised 12 to 14 employees. At the time of this litigation, Thornton had worked in the engineering-services area of government contracts for more than 24 years and had established and maintained business associations with several technical monitors during that time. Teague had also established relationships with a number of *859 technical monitors during his 14 years in the industry.
Both Thornton and Teague signed various employment forms while they were employed with DFI and later with Kratos indicating that they were “at will” employees. When Kratos Defense merged with DFI in 2008, Thornton signed an “Employment and Retention Agreement” with Kra-tos that contained a “Non-Competition and Non-Interference” provision and a “Confidential Information and Non-Disclosure” provision. The noncompetition and noninterference provision, which prohibited employees from competing with Kratos, being involved with Kratos’s competitors, soliciting Kratos’s customers, and soliciting Kratos’s employees, were applicable for two years from December 24, 2008, the effective date of the agreement, which was the date of the merger of Kratos Defense and DFI. Thus, that provision expired in late December 2010. The confidential information and nondisclosure provision was not limited in time, but included restrictions concerning Kratos’s intellectual property, trade secrets, and any information concerning the business affairs of the business, and any notes, analyses, compilations, studies, summaries, and other material prepared by or for Kratos. Teague did not sign an “Employment and Retention Agreement.”
Both Thornton and Teague signed forms acknowledging receipt of the “KRATOS Handbook for Digital Fusion Employees” (“the handbook”). The handbook discussed the continuing “at-will” nature of the employment relationship of former DFI employees in three places. The handbook addressed nonsolicitation of Kratos employees and forbade any Kratos employee, for one year after the termination of his or her employment, from soliciting or encouraging any Kratos employee to leave Kratos’s employ. The handbook outlined expectations for the use of trade secrets and confidential information by Kratos’s employees.
In February 2009, Thornton and Teag-ue, who were both employed by Kratos at the time, met with Doyle McBride, a NASA consultant who had never been employed by Kratos, to discuss starting a new company to perform government contract work. Several months later, MSRC was incorporated, with McBride and Teague each owning 50 percent. Thornton had no legal interest in MSRC at its formation. McBride acquired office space, issued stock, filed tax returns, obtained business licenses, registered to engage in government contracting, attended meetings, and talked with prime contractors on MSRC’s behalf.
In April 2010, the Army sought proposals for task order 23. CSC was one of the prime contractors bidding on task order 23. McBride submitted the information necessary for MSRC to become a subcontractor for CSC on task order 23. Both Thornton and Teague testified that they were not involved in submitting information to CSC on behalf of MSRC to become a subcontractor for task order 23. On April 30, 2010, the Army awarded task order 23 to CSC.
On August 17, 2010, CSC entered into a subcontract agreement with MSRC on task order 23. Subsequently, MSRC received its first technical instruction. McBride, on behalf of MSRC, forwarded the invoices to be paid for the work completed by Dan Brown, who had been recommended for the task by Teague. In November or December 2010, A1 Wright, a technical monitor, awarded MSRC another technical instruction. On March 7, 2011, CSC also entered into a subcontract agreement with Kratos. The record indicates that Thornton was instrumental in getting the subcontract awarded to Kratos.
*860 The subcontract between CSC and MSRC and the subcontract between CSC and Kratos contain the following language:

“H-28. Special Provisions and Clauses

“Wherever appropriate to make the following incorporated clauses applicable to this Agreement, references to the Government or Contracting Officer shall mean CSC or Subcontracts Administrator respectively. Furthermore, wherever appropriate, references to Contractor and Contract shall mean Subcontractor and Subcontract respectively.
[[Image here]]

“2. Change-Over

“Subcontractor may be replaced by a succeeding contractor(s) in the performance of work contemplated by this Agreement. It is recognized that the best interests of the Government will be served through employment by the succeeding contraetor(s) of those Subcontractor employees who may be acceptable to the succeeding contractor(s) and the Government. The Subcontractor shall cooperate fully with the Government, CSC, and the succeeding contractor(s) designated in writing by CSC to effect an orderly and efficient transition. This includes:
[[Image here]]
“(b) Permitting employees to be interviewed by the Government or the succeeding contractor(s) for possible employment;
“(c) Releasing any employee who chooses to be employed by a succeeding eon-tractor(s).... ”
This changeover provision permitted employees to leave one subcontractor and go to work for another and established a mandatory dispute-resolution procedure that must precede any litigation based on such a change in employment.
In or around July 2012, Wright, a technical monitor, had notified Teague of a possible new technical instruction that related to designing a laser target simulator. When Wright asked Teague for his advice on assistance with the instruction, Teague suggested Brown because Brown and Teague had worked together previously, although not at Kratos. Brown had never been employed by Kratos. Wright asked Teague if Teague could get Brown on AM-COM Express. According to MSRC, Teague testified that he believed that Brown would not work for Kratos under AMCOM Express, because he had previously sought to get Brown to work for Kratos and Brown had refused. Thus, when Teague asked Wright if he wanted to consider another BPA team for access to Brown, Wright responded affirmatively. Teague then introduced Brown to McBride, and McBride, on behalf of MSRC, reached an agreement with Brown. Kratos contends that Teague never presented it with the opportunity to employ Brown as a team member even though Teague was employed by Kratos.
Around April 2011, MSRC hired Kim Holt and Michael Swamp, neither of whom were former employees of Kratos. On several occasions in the spring of 2011, Teague and Angela Plunkett, an employee of Kratos, helped prepare ROMs for MSRC and then forwarded them to McBride for submission. When Plunkett was terminated by Kratos in June 2011, she inquired about available positions with MSRC. Teague held a lunch meeting with several Kratos employees in the spring of 2011 to inform them of opportunities with MSRC. The record is unclear as to when the luncheon occurred. David Smith, who had previously worked for Kratos, was interviewed by Swamp and was hired by McBride in spring 2011, after having had lunch with Teague. Lonnie Trippe also *861 attended a lunch with Teague at which he was informed about possible opportunities with MSRC. Trippe stated that Swamp interviewed him for a position with MSRC and that Teague did not encourage him to leave his employment with Kratos. Subsequently, in June 2011, MSRC hired Jeff Blailock, who had previously worked for Kratos under Teague, but who testified that neither Thornton nor Teague induced him to leave Kratos to go to work for MSRC.
In June 2011, Stacey Rock, who served as Thornton’s supervisor, learned that several employees under Teague’s supervision had resigned in a short period. Following Rock’s investigation, Kratos terminated Teague’s employment on June 23, 2011; Thornton resigned four days later. Teag-ue and Thornton then went to work for MSRC. Thornton subsequently purchased MSRC from McBride and became its CEO and president.
On June 29, 2011, Kratos filed a complaint against MSRC, Thornton, and Teag-ue alleging specifically that Thornton and Teague, while employed by Kratos, assisted in the creation of MSRC, solicited Kra-tos employees, wrongfully diverted business opportunities, and misappropriated confidential and proprietary information. Kratos also alleged that MSRC wrongfully diverted business opportunities and misappropriated confidential and proprietary information. Kratos applied for a temporary restraining order (“TRO”) and for a preliminary injunction on June 29, 2011. On June 30, 2011, the trial court granted Kratos’s request for a TRO and ordered Kratos to post $100,000 bond. Kratos subsequently amended its complaint to add a claim alleging civil conspiracy. The trial court conducted hearings on July 19 and 20, 2011, in which Kratos presented three witnesses. Based on time constraints of the trial court, MSRC, Thornton, and Teague were able to present only one witness. MSRC, Thornton, and Teague, however, submitted the complete deposition transcripts of Thornton, Stacey Rock, Jeffrey Blailock, Lonnie Trippe, and David Smith. At the conclusion of the two-day hearing, the trial judge stated that the TRO would be extended until the trial court “otherwise enters an order.”[4] Both parties filed post-hearing briefs on July 22, 2011. On September 7, 2011, MSRC, Thornton, and Teague filed a motion to dissolve the TRO, which had been issued over two months previously. Shortly thereafter, on September 10, 2011, the trial court granted Kratos’s request for a preliminary injunction and enjoined MSRC, Thornton, and Teague from, among other things, performing any work on any AMCOM Express contract assigned or funded after June 2011. MSRC, Thornton, and Teague appealed. See Rule 4(a)(1)(A), Ala. R.App. P. MSRC, Thornton, and Teague also filed an emergency motion to stay the preliminary injunction pending appeal, which this Court denied.
On appeal, MSRC, Thornton, and Teag-ue argue that the preliminary injunction should be dissolved. MSRC, Thornton, and Teague raise several issues on appeal; however, because we conclude that the trial court’s order is overbroad and that it failed to comply with Rule 65, Ala. R. Civ. P., we need not reach any of their other issues.
When this Court reviews the grant or denial of a preliminary injunction, “ ‘[w]e review the ... [cjourt’s legal rul *862 ings de novo and its ultímate decision to issue the preliminary injunction for [an excess] of discretion.’ ” Holiday Isle, LLC v. Adkins, 12 So.3d 1173, 1176 (Ala.2008) (quoting Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 428, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006)).
“A preliminary injunction should be issued only when the party seeking an injunction demonstrates:
“ ‘ “(1) that without the injunction the [party] would suffer irreparable injury; (2) that the [party] has no adequate remedy at law; (3) that the [party] has at least a reasonable chance of success on the ultimate merits of his case; and (4) that the hardship imposed on the [party opposing the preliminary injunction] by the injunction would not unreasonably outweigh the benefit accruing to the [party seeking the injunction].” ’ ”
Holiday Isle, 12 So.3d at 1176 (quoting Ormco Corp. v. Johns, 869 So.2d 1109, 1113 (Ala.2003), quoting in turn Perley v. Tapscan, Inc., 646 So.2d 585, 587 (Ala.1994) (alterations in Holiday Isle)).
“ ‘ “Irreparable injury” is an injury that is not redressable in a court of law through an award of money damages.’ [Perley v. Tapscan, Inc.,] 646 So.2d [585,] 587 [ (Ala.1994) ] (citing Triple J Cattle, Inc. v. Chambers, 551 So.2d 280 (Ala.1989)). However, ‘courts will not use the extraordinary power of injunc-tive relief merely to allay an apprehension of a possible injury; the injury must be imminent and irreparable in a court at law.’ Martin v. City of Linden, 667 So.2d 732, 736 (Ala.1995); see also Borey v. National Union Fire Ins. Co. of Pittsburgh, 934 F.2d 30, 34 (2d Cir.1991) (stating that ‘a mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction’).”
Ormco Corp., 869 So.2d at 1113-14. A plaintiff that can recover damages has an adequate remedy at law and is not entitled to an injunction. SouthTrust Bank of Alabama, N.A. v. Webb-Stiles Co., 931 So.2d 706, 709 (Ala.2005). The party seeking the injunction has the burden of demonstrating that it lacks an adequate remedy. Ormco Corp., 869 So.2d at 1113.
In its order preliminarily enjoining MSRC, Thornton, and Teague, the trial court stated:
“This matter is before the Court on [Kratos’s] Motion for Preliminary Injunction against Defendants Steven L. Thornton (‘Thornton’), Steven B. Teague (‘Teague’) and Monte Sano Research Corporation (‘MSRC’) (collectively referred to as ‘Defendants’). A hearing on this motion was held before this Court on July 19-20, 2011. After considering the evidence and testimony, arguments from counsel, and briefs submitted in this action, [Kratos’s] Motion is hereby GRANTED.
“The Court finds that [Kratos has], under the facts and circumstances of this case, a protectable interest in [its] relationships with [its] employees, customers, including the United States Army, and in [its] confidential information. The Court further finds that there is a substantial likelihood that [Kratos] will prevail on the merits of [its] breach of duty of loyalty claims against Thornton and Teague, [its] breach of contract claims against Thornton and Teague and [its] tortious interference claims against Thornton, Teague, and MSRC. The Court additionally finds that a balancing of the harms favors granting this injunction and that irreparable injury to [Kra-tos] will result if a preliminary injunction is not issued.”
*863 The trial court enjoined MSRC, Thornton, and Teague from:
“i) performing any work on or receiving any compensation for services rendered pursuant to any AMCOM EXPRESS contract for any of the prime contractors to that contract, including but not limited to, Computer Sciences Corporation (CSC); Aviation and Missile Solutions (AMS); Torch Technologies; Radiance Technologies; and Sigmatech, Inc.; provided, however, Thornton, Teague, and MSRC are not prohibited from performing work previously assigned or funded on or before June 29, 2011.
“ii) using or disclosing any trade secrets, confidential information, or proprietary information of [Kratos].
“iii) soliciting for employment [Kra-tos’s] current employees as of June 29, 2011.”
In its order, the trial court enjoined MSRC, Thornton, and Teague from procuring any work from any prime contractor at Redstone Arsenal, regardless of domain—technical or otherwise. Thus, we conclude that the injunction is overbroad and is not supported by the evidence. The record indicates that Kratos was concerned only with task order 23; and had performed work only in the technical domain. The record shows that MSRC, however, had negotiated with other prime contractors to do work other than work solely in the technical domain. This injunction directs that MSRC cannot provide subcontract work at Redstone Arsenal for any prime contractor in any domain, which is too broad a prohibition.
Furthermore, an examination of the trial court’s order reveals that it violated Rule 65(d)(2), Ala. R. Civ. P., by failing to provide the reasons for the issuance of the injunction and failing to be specific in its terms.
Rule 65(d)(2), in pertinent part, provides as follows:
“(2) Every order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document the act or acts sought to be restrained....”
It is apparent that the order does not comply with Rule 65(d)(2). Here, although the trial court does recite three of the four requirements for the issuance of a preliminary injunction as outlined in Holiday Isle, supra, and does state that Kratos had established each of those requirements, it does not give specific reasons for its decision. The trial court did not address whether an adequate remedy at law existed for Kratos. Pursuant to Rule 65, it is mandatory that a preliminary-injunction order give reasons for the issuance of the injunction, that it be specific in its terms, and that it describe in reasonable detail the act or acts sought to be restrained. Therefore, because the provisions of Rule 65(d)(2) were not complied with and because there was no evidence of an irreparable injury or the lack of an adequate remedy at law, the trial court erred in issuing the preliminary injunction. We reverse the trial court’s order entering the preliminary injunction and remand the case to the trial court with directions that it dissolve the preliminary injunction it issued September 10, 2011. This decision is not to be interpreted as precluding Kra-tos, should it deem it necessary, from requesting the trial court to again issue a preliminary injunction, provided that any resulting injunction is narrower in scope and complies with Rule 65, Ala. R. Civ. P.
REVERSED AND REMANDED WITH DIRECTIONS.
*864 MALONE, C.J., and STUART and WISE, JJ„ concur.
MURDOCK, J., concurs specially.
WOODALL, BOLIN, and SHAW, JJ., concur in the result.
PARKER, J., recuses himself.

. Kratos filed as part of the record a federal Form 8-K, which states that Kratos Defense and DFI executed a "merger agreement” in 2008. However, the complaint was filed in the names of the three separate entities— Kratos Defense, DFI, and DFSI, which appears inconsistent with a merger of Kratos Defense and DFI. For purposes of this opinion, we refer to Kratos Defense, DFI, and DFSI collectively as Kratos.

. AMCOM refers to the Army Aviation and Missile Command, which is headquartered at Redstone Arsenal in Huntsville.

. See supra note 1.

. We note that the trial court attempted to extend the TRO. However, the TRO had expired; moreover, the TRO failed to comply with Rule 65(b), Ala. R. Civ. P. We pretermit further discussion of this issue because of our resolution of the preliminary-injunction issue before us.