ALITO, J., concurring in judgment

# SUPREME COURT OF THE UNITED STATES

## AMOS MAST, ET AL. *v.* FILLMORE COUNTY, MINNESOTA, ET AL.

### ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF APPEALS OF MINNESOTA

No. 20–7028.  Decided July 2, 2021

The motion of petitioners for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted.  The judgment is vacated, and the case is remanded to the Court of Appeals of Minnesota for further consideration in light of *Fulton* v. *Philadelphia*, 593 U. S. ___ (2021).

JUSTICE ALITO, concurring in the judgment.

I agree that we should vacate the judgment below and remand for further consideration.  The lower court plainly misinterpreted and misapplied the Religious Land Use and Institutionalized Persons Act.

# SUPREME COURT OF THE UNITED STATES

AMOS MAST, ET AL. *v.* FILLMORE COUNTY,
MINNESOTA, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE COURT
OF APPEALS OF MINNESOTA

No. 20–7028.   Decided July 2, 2021

JUSTICE GORSUCH, concurring in the decision to grant, vacate, and remand.

The Swartzentruber Amish are religiously committed to living separately from the modern world.  Maintaining that commitment is not easy.  They grow their own food, tend their farms using pre-industrial equipment, and make their own clothes.  In short, they lead lives of faith and self-reliance that have "not altered in fundamentals for centuries." *Wisconsin* v. *Yoder*, 406 U. S. 205, 216–217 (1972).

In this long-running litigation, officials in Fillmore County, Minnesota have insisted that the Amish must adopt certain modern technologies or risk jail, fines, and even losing their farms.  Today, the Court grants the Amish's petition for review, vacates the lower court's decisions, and remands this case for further proceedings in light of our recent decision in *Fulton* v. *Philadelphia*, 593 U. S. \_\_\_ (2021).  I support this decision and write to highlight a few issues the lower courts and administrative authorities may wish to consider on remand.

\*

Each Amish community has its own body of religious rules, called an *Ordnung*.  When a community must decide whether its faith permits a certain action—say, using the phone at a neighbor's farm should a fire break out—it makes that decision collectively.  Sometimes there are disagreements and communities fracture.  Over time, this phenomenon has led to approximately 40 different affiliations

within the broader Amish community across the United States. The Swartzentruber Amish are among the most traditional.

Today's dispute is about plumbing, specifically the disposal of gray water—water used in dishwashing, laundry, and the like. The Swartzentruber Amish do not have running water in their homes, at least as most would understand it. Water arrives through a single line and is either pumped by hand or delivered by gravity from an external cistern.

In 2013, Fillmore County adopted an ordinance requiring most homes to have a modern septic system for the disposal of gray water. See App. to Pet. for Cert. 3; Minn. Stat. §115.55(2)(a) (2020); Minn. Admin. Rules 7080.1050–7080.2550 (2019); Fillmore County, Sub-Surface Sewage Treatment System Ordinance §§501–502 (2013). Responding to this development, the Swartzentruber Amish submitted a letter explaining that their religion forbids the use of such technology and "'asking in the name of our Lord to be exempt'" from the new rule. App. to Brief in Opposition for Respondent Minnesota Pollution Control Agency 78 (MPCA App.). Instead of accommodating this request or devising a solution that respected the Amish's faith, the Minnesota Pollution Control Agency filed an administrative enforcement action against 23 Amish families in Fillmore County demanding the installation of modern septic systems under pain of criminal penalties and civil fines. *Id.*, at 79.

Faced with this action, the Amish filed their own declaratory judgment suit in state court against Fillmore County and the Minnesota Pollution Control Agency (collectively, the County), alleging that the County's septic-system mandate violated the federal Religious Land Use and Institutionalized Persons Act (RLUIPA). But the Amish also offered an alternative. They offered to install systems that clean gray water in large earthen basins filled with wood chips that filter water as it drains. These wood chip basins

may be more primitive than modern septic systems, but other jurisdictions permit their use for the disposal of gray water. See App. to Pet. for Cert. 4; *id.*, at 73–74.

Evidently, none of this pleased the authorities. The County replied by filing a counterclaim seeking an order displacing the Amish from their homes, removing all their possessions, and declaring their homes uninhabitable if the Amish did not install septic systems within six months. MPCA App. 80. The County even unsuccessfully sought a court order authorizing its agents to inspect the inside of Amish homes as part of an investigation into what "types of modern technologies and materials" they might be using. *Id.*, at 81. Apparently, this was part of an effort to amass "evidence" to "attack the sincerity of [the Amish's] religious beliefs." *Ibid.*, n. 5.

Eventually, the case proceeded to trial. There, the state trial court rejected the County's most aggressive arguments, including (1) its claim that the Amish's "limited use of telephones" proved that their objection to modern septic systems was contrived, App. to Pet. for Cert. 43; (2) its argument that the Bible commands the Amish to submit to "secular authority," *id.*, at 44, n. 16; and (3) its assertion that installing septic systems represented only a *de minimis* burden on the Amish's religious beliefs because they sometimes "use various items of 'modern' technology," such as "some rubber tires" or "power tools," *id.*, at 50. At the same time, however, the trial court sided with the County on the merits, requiring the Amish to install modern septic systems. The Minnesota Court of Appeals affirmed and the Minnesota Supreme Court denied review. *Id.*, at 2, 76.

\*

*Fulton* makes clear that the County and courts below misapprehended RLUIPA's demands. That statute requires the application of "strict scrutiny." Under that form of review, the government bears the burden of proving both

that its regulations serve a "compelling" governmental in-
terest—and that its regulations are "narrowly tailored."
*Fulton*, 593 U. S., at ___ (slip op., at 13); 42 U. S. C.
§2000cc(a)(1) ("No government shall impose or implement
a land use regulation in a manner that imposes a substan-
tial burden on the religious exercise of a person . . . unless
the government demonstrates that imposition of the bur-
den . . . is in furtherance of a compelling government inter-
est; and is the least restrictive means of furthering that
compelling governmental interest").

Perhaps most notably, the County and courts below erred
by treating the County's *general* interest in sanitation reg-
ulations as "compelling" without reference to the *specific*
application of those rules to *this* community. As *Fulton* ex-
plains, strict scrutiny demands "a more precise analysis."
593 U. S., at ___ (slip op., at 14). Courts cannot "rely on
'broadly formulated'" governmental interests, but must
"'scrutinize[] the asserted harm of granting specific exemp-
tions to particular religious claimants.'" *Ibid.* (quoting
*Gonzales* v. *O Centro Espírita Beneficente União do Vegetal*,
546 U. S. 418, 431 (2006)). Accordingly, the question in this
case "is not whether the [County] has a compelling interest
in enforcing its [septic system requirement] *generally*, but
whether it has such an interest in denying an exception"
from that requirement to the Swartzentruber Amish *specif-
ically*. *Fulton*, 593 U. S., at ___ (slip op., at 14) (emphasis
added); see also *Holt* v. *Hobbs*, 574 U. S. 352, 362–363
(2015) (RLUIPA requires courts to "scrutiniz[e] the as-
serted harm of granting specific exemptions to *particular*
religious claimants" (internal quotation marks omitted; em-
phasis added)).*

——————

*Before this Court, the County argues chiefly that the Amish forfeited
this aspect of the law's protections by failing to press it sufficiently below.
That is incorrect. The Amish asked the Minnesota Supreme Court to
review whether the County had proved the absence of any "alternative

Separately, the County and lower courts erred by failing to give due weight to exemptions other groups enjoy. For example, in Minnesota those who "hand-carr[y]" their gray water are allowed to discharge it onto the land directly. Minn. Admin. Rule 7080.1500, §2. So thousands of campers, hunters, fishermen, and owners and renters of rustic cabins are exempt from the septic system mandate. Under strict scrutiny doctrine, the County must offer a compelling explanation why the same flexibility extended to others cannot be extended to the Amish. As *Fulton* put it, the government must offer a "compelling reason why it has a particular interest in denying an exception to [a religious claimant] while making [exceptions] available to others." 593 U. S., at \_\_\_ (slip op., at 15). Or as this Court has said elsewhere, it is "established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 547 (1993) (internal quotation marks and alteration omitted); see also *Holt*, 574 U. S., at 367 ("[T]he Department has not adequately demonstrated why its grooming policy is substantially underinclusive"); *O Centro Espírita*, 546 U. S., at 436 ("The Government's argument echoes the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions").

———————

means for adequately disposing of household gray water that is less restrictive on *Petitioners'* freedom to exercise their religious beliefs." MPCA App. 41 (boldface omitted; emphasis added). And they argued in the Minnesota Court of Appeals that "RLUIPA requires the court to scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants." *Id.*, at 112 (internal quotation marks omitted). In any event, this Court has now vacated and remanded the decisions below, affording the County and courts below alike another opportunity to consider this issue.

Relatedly, the County and lower courts failed to give sufficient weight to rules in other jurisdictions. Governments in Montana, Wyoming, and other States allow for the disposal of gray water using mulch basins of the sort the Amish have offered to employ. App. to Pet. for Cert. 73–74. Given that, the County in this case bore the burden of presenting a "compelling reason why" it cannot offer the Amish this same alternative. *Fulton*, 593 U. S., at ___ (slip op., at 15). To be sure, the County stresses the fact that the "record contains no evidence of a single, properly working mulch basin system in Minnesota." App. to Pet. for Cert. 74. But that is not enough. It is the government's burden to show this alternative won't work; not the Amish's to show it will. "[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U. S., at ___ (slip op., at 13).

Finally, despite acknowledging that mulch basins could "theoretically" work, the County and lower courts rejected this alternative based on certain assumptions. They assumed that suitable sites for mulch basins could not be found on the Amish's farms—and that maintaining the basins would prove too much work. See, *e.g.,* App. to Pet. for Cert. 67 ("It is questionable whether one could even find sites on the Plaintiffs' farms in Fillmore County that would" satisfy the technical requirements for an effective mulch system); *ibid.* ("[S]ites that would satisfy that requirement may simply not be available to the Plaintiffs"); *id.,* at 68 ("[T]he maintenance required to keep such a system properly operating would be so burdensome as to render it unfeasible"); *ibid.* ("[I]n Dr. Heger's opinion, this maintenance requirement makes the mulch basin concept unworkably labor intensive"); *id.*, at 69 ("'I don't think it's practical'"). But strict scrutiny demands more than supposition. The County must prove with evidence that its rules are narrowly tailored to advance a compelling state interest with respect to the specific persons it seeks to regulate. Here,

that means proving that mulch basins will not work on these particular farms with these particular claimants. Again, if "the government can achieve its interests in a manner that does not burden religion, *it must do so*." *Fulton*, 593 U. S., at \_\_\_ (slip op., at 13) (emphasis added); see also *Tandon* v. *Newsom*, 593 U. S. \_\_\_, \_\_\_ (2021) (*per curiam*) (slip op., at 3) ("The State cannot 'assume the worst when people go to worship but assume the best when people go to work'" (quoting *Roberts* v. *Neace*, 958 F. 3d 409, 414 (CA6 2020) (*per curiam*))).

\*

RLUIPA prohibits governments from infringing sincerely held religious beliefs and practices except as a last resort. Despite that clear command, this dispute has staggered on in various forms for over six years. County officials have subjected the Amish to threats of reprisals and inspections of their homes and farms. They have attacked the sincerity of the Amish's faith. And they have displayed precisely the sort of bureaucratic inflexibility RLUIPA was designed to prevent. Now that this Court has vacated the decision below, I hope the lower courts and local authorities will take advantage of this "opportunity for further consideration," *Lawrence* v. *Chater*, 516 U. S. 163, 167 (1996) (*per curiam*), and bring this matter to a swift conclusion. In this country, neither the Amish nor anyone else should have to choose between their farms and their faith.