KAVANAUGH, Circuit Judge,
dissenting from the denial of rehearing en banc:
In my respectful view, the panel opinion misapplies the Religious Freedom Restoration Act and contradicts the Supreme Court’s recent decisions in Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 189 L.Ed.2d 675 (2014), Wheaton College v. Burwell, — U.S. -, 134 S.Ct. 2806, 189 L.Ed.2d 856 (2014), and Little Sisters of the Poor Home for the Aged v. Sebelius, - U.S. -, 134 S.Ct. 1022, 187 L.Ed.2d 867 (2014). I would grant rehearing en banc and rule for the plaintiff religious organizations.
At the outset, it is important to recognize that two of the key Supreme Court precedents here — Hobby Lobby and Wheaton College — were divided decisions with vigorous dissents. Some believe that those two decisions tilted too far in the direction of religious freedom. Others, by contrast, think that those decisions did not go far enough in the direction of religious freedom. We are a lower court in a hierarchical judicial system headed by “one supreme Court.” U.S. Const. art. Ill, § 1. It is not our job to re-litigate or trim or expand Supreme Court decisions. Our job is to follow them as closely and carefully and dispassionately as we can. Doing so here, in my respectful view, leads to the conclusion that the plaintiff religious organizations should ultimately prevail on their RFRA claim, but not to the full extent that they seek.
Some background: The Affordable Care Act requires most employers, including non-profit organizations, to provide health insurance coverage for their employees or else pay a significant monetary penalty to the Government. By regulation, that insurance must cover all FDA-approved contraceptives, including certain methods of birth control that, some believe, operate as abortifacients and result in the destruction of embryos.
As a religious accommodation, the regulations exempt religious non-profit organizations from the contraceptive mandate. To be exempt from the monetary penalty, however, the religious organizations must either submit a form with certain required information to their insurer or submit a letter with certain required information to the Secretary of Health and Human Services.[1] (For ease of reference, I will use the term “form” to cover both documents.) The insurer must continue to provide con *15 traceptive coverage to the religious organizations’ employees, albeit with separate funds provided either by the insurer itself or by the United States.
Many prominent religious organizations around the country' — including the plaintiffs in this case — have bitterly objected to this scheme. ' They complain that submitting the required form contravenes their religious beliefs because doing so, in their view,, makes them complicit in providing coverage for contraceptives, including some that they believe operate as abortifa-cients. They say that the significant monetary penalty for failure to submit the form constitutes a substantial burden on their exercise of religion. They contend, moreover, that the Government has less restrictive ways of ensuring that the employees of the religious organizations have access to contraception without making the organizations complicit in the scheme in this way.
The plaintiffs in this case have sued under the Religious Freedom Restoration Act, known as RFRA. RFRA grants individuals and organizations an exemption from generally applicable federal laws that “substantially burden” their “exercise of religion,” unless the Government demonstrates that the law furthers a “compelling governmental interest” and is the “least restrictive means” of furthering that interest. 42 U.S.C. § 2000bb-1.[2] As the Supreme Court has explained, “RFRA was designed to provide very broad protection for religious liberty.” Hobby Lobby, 134 S.Ct. at 2767. RFRA statutorily incorporated the compelling interest test that the Supreme Court had applied in cases such as Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). 42 U.S.C. § 2000bb(b)(1).
Under RFRA and the relevant Supreme Court case law, we must consider three questions here. First, do the regulations — which compel religious organizations to submit the required form or else pay significant monetary penalties — “substantially burden” the religious organizations’ “exercise of religion?” Second, if so, does the Government have a “compelling” interest in facilitating access to contraception for the employees of these religious organizations? Third, if the Government does have such a compelling interest, do the regulations represent the “least restrictive” means of furthering that interest?
I conclude as follows:
First, under Hobby Lobby, the regulations substantially burden the religious organizations’ exercise of religion because the regulations require the organizations to take an action contrary to their sincere religious beliefs (submitting the form) or else pay significant monetary penalties.
Second, that said, Hobby Lobby strongly suggests that the Government has a compelling interest in facilitating access to contraception for the employees of these religious organizations.
Third, this case therefore comes down to the least restrictive means question. Under Hobby Lobby, Wheaton College, and Little Sisters of the Poor, requiring the religious organizations to submit this form is not the Government’s least restrictive means of furthering its interest in facilitat *16 ing access to -contraception for the organizations’ employees. Rather, the Government can achieve its interest even if it accepts the less restrictive notice that the Supreme Court has already relied on in the Wheaton College and Little Sisters of the Poor cases. Unlike the form required by current federal regulations, the Whea-ton College/Little Sisters of the Poor notice does not .require a religious organization to identify or notify its insurer, and thus lessens the religious organization’s complicity in what it considers to be wrongful. And even with just the Wheaton College/Little Sisters of the Poor notice, the Government can independently determine the identity of the organization’s insurer and thereby ensure that the same insurer continues to provide the same contraceptive coverage to the organization’s employees. Hence, the Wheaton College/Little Sisters of the Poor notice is a less restrictive way for the Government to achieve its compelling interest.
I
First, under Hobby Lobby, this regulatory scheme imposes a substantial burden on plaintiffs’ exercise of religion.
Under RFRA, a substantial burden on the exercise of religion occurs when, for example, the Government imposes sanctions or punishment on someone, or denies a benefit to someone, for exercising his or her religion. Thus, if the Government requires someone (under threat of incurring monetary sanctions or punishment, or of having a benefit denied) to act or to refrain from acting in violation of his or her sincere religious beliefs, that constitutes a substantial burden on the exercise of religion. See Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 2775-79, 189 L.Ed.2d 675 (2014); Thomas v. Review Board of Indiana Employment Security Division, 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); Sherbert v. Verner, 374 U.S. 398, 403-04, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).
That is precisely what has happened here.
The “substantial burden” in this case comes from the large monetary penalty imposed on religious organizations that choose not to submit the required form. Cf. Hobby Lobby, 134 S.Ct. at 2775-76, 2779. It is settled that a direct monetary penalty on the exercise of religion constitutes a “substantial burden.” See id. (penalty for not providing contraceptive coverage); Wisconsin v. Yoder, 406 U.S. 205, 208, 218-19, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (fine for not sending children to high school); Sherbert, 374 U.S. at 404, 83 S.Ct. 1790 (describing hypothetical fine for Saturday worship).[3]
*17 Therefore, the remaining question with respect to the first prong of the RFRA analysis is whether submitting the form actually contravenes plaintiffs’ sincere religious beliefs. In analyzing that question, we must first understand the context in which the question arises. In most religious liberty cases, the Government has said in essence: “Do X or suffer a penalty.” The religious objector responds that X violates his or her religious beliefs. For example, in the recent Holt v. Hobbs case, it was “shave your beard or suffer a penalty.” See Holt v. Hobbs, — U.S. —, 135 S.Ct. 853, 860-61, 190 L.Ed.2d 747 (2015). Or in the classic Wisconsin v. Yoder case, it was “send your children to high school or pay a $5 fine.” See 406 U.S. at 208, 92 S.Ct. 1526. Or in United States v. Lee, it was “pay the Social Security tax or suffer a penalty.” See 455 U.S. 252, 254-55, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982). Simple enough.
Here, the situation is only slightly more complicated. The Government has said in essence: “Do X or Y or suffer a penálty.” X is provide contraceptive coverage. Y is submit the form. All agree that X — providing contraceptive coverage — implicates plaintiffs’ “exercise of religion.” But religious organizations can avoid that option by choosing Y — submitting the form. In other words, the Government is exempting religious organizations from providing contraceptive coverage but is still saying: “Submit the form 'or suffer a penalty.”
As a result, the key inquiry under the first prong of RFRA is whether submitting the form violates plaintiffs’ sincere religious beliefs. The form is part of the process by which the Government ensures that the religious organizations’ insurers provide contraceptive coverage to the organizations’ employees. To plaintiffs, the act of “submitting” this form would, “in their religious judgment, impermissibly facilitate!] delivery” of contraceptive and abortifacient coverage. Plaintiffs’ Supplemental Br. 1.
As the Supreme Court stated in Hobby Lobby, such a question of complicity — that is, when “it is wrong for a person to perform an act that is innocent in itself but that has the effect of enabling or facilitating the commission of an immoral act by another” — is. “a difficult and important question of religion and moral philosophy.” Hobby Lobby, 134 S.Ct. at 2778. Judge Gorsuch has explained well the complicity issue that arises in these circumstances: “All of us face the problem of complicity. All of us must answer for ourselves whether and to what degree we are willing to be involved in the wrongdoing of others. For some, religion provides an essential source of guidance both about what constitutes wrongful conduct and the degree to which those who assist others in committing wrongful conduct themselves bear moral culpability. [Plaintiffs] are among those who seek guidance from their faith on these questions. Understanding that is the key to understanding this case.” Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1152 (10th Cir.2013) (Gorsuch, J., concurring).
But what if the religious organizations are misguided in thinking that this scheme — in which the form is part of the process by which the Government ensures contraceptive coverage — makes them complicit in facilitating contraception or abortion? That is not our call to make under the first prong of RFRA. The Supreme Court has emphasized that judges in RFRA cases may question only the sincerity of a plaintiffs religious belief, not the correctness or reasonableness of that religious belief. See Hobby Lobby, 134 S.Ct. at 2774 n. 28, 2777-79; see also Thomas, 450 U.S. at 714-16, 101 S.Ct. 1425.[4] The *18 Supreme Court has long stated, moreover, that religious beliefs need not be “acceptable, logical, consistent, or comprehensible to others” in order to merit protection. Thomas, 450 U.S. at 714, 101 S.Ct. 1425. As Justice Brennan, the primary architect of the body of religious freedom law now incorporated into RFRA, once put it: “[Rjeligious freedom — the freedom to believe and to practice strange and, it may be, foreign creeds — has classically been one of the highest values of our society.” Braunfeld v. Brown, 366 U.S. 599, 612, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (Brennan, J., concurring in part and dissenting in part).
That bedrock principle means that we may not question the wisdom or reasonableness (as opposed to the sincerity) of plaintiffs’ religious beliefs — including about complicity in wrongdoing. In Hobby Lobby, the Supreme Court emphatically confirmed that point. There, as here, the Government argued that the employers’ alleged complicity in providing contraeeption did not infringe on the employers’ religious beliefs. In particular, the Government claimed that “the connection between what the objecting parties must do” (pay for insurance) and “the end that they find to be morally wrong (destruction of an embryo)” was “simply too attenuated” because the end would occur only as a result of intervening decisions by individual covered employees. Hobby Lobby, 134 S.Ct. at 2777.
The Supreme Court adamantly rejected the basic premise of the Government’s argument. The Court emphasized that federal courts have “no business” trying to answer whether the religious beliefs asserted in a RFRA case — including the complicity belief at issue in Hobby Lobby — are correct or reasonable. Id. at 2778. A federal court may not tell the objectors that “their beliefs are flawed,” and thus may not arrogate to itself “the authority to provide a binding national answer to this religious and philosophical *19 question” of complicity. Id. at 2778. Instead, the “narrow function” of federal courts is to determine whether the belief is sincere and “reflects an honest conviction.” Id. at 2779 (internal quotation marks omitted). In doing so, moreover, courts must keep in mind that RFRA protects “any exercise of religion, whether or not compelled by, or central to, a system of religious belief.” 42 U.S.C. § 2000ec-5(7)(A) (defining “religious exercise” for purposes of the related Religious Land Use and Institutionalized Persons Act); see id. § 2000bb-2 (incorporating that Act’s definition set forth in § 2000cc-5 into RFRA).
As a matter of religious belief, plaintiffs in this case say that the act of submitting the required form makes them complicit in moral wrongdoing. Importantly, no one here disputes that plaintiffs’ religious belief is sincere and reflects an honest conviction. Cf. Wheaton College v. Burwell, — U.S. -, 134 S.Ct. 2806, 2808, 189 L.Ed.2d 856 (2014) (Sotomayor, J., dissenting) (“The sincerity of Wheaton’s deeply held religious beliefs is beyond refute.”); id. at 2812. Therefore, plaintiffs’ decision to decline to submit the required letter or form is an “exercise of religion” under RFRA. No one disputes, moreover, that plaintiffs will be required to pay huge monetary penalties if they do not submit the required form. Those large monetary penalties plainly represent a “substantial burden” on plaintiffs’ exercise of religion. See Hobby Lobby, 134 S.Ct. at 2759.
Judge Flaum persuasively summarized the point in a similar case that involved Notre Dame: “Yet we are judges, not moral philosophers or theologians; this is not a question of legal causation but of religious faith. Notre Dame tells us that Catholic doctrine prohibits the action that the government requires it to take. So long as that belief is sincerely held, I believe we should defer to Notre Dame’s understanding.” University of Notre Dame v. Sebelius, 743 F.3d 547, 566 (7th Cir.2014) (Flaum, J., dissenting), vacated and remanded, — U.S. -, 135 S.Ct. 1528, 191 L.Ed.2d 557 (2015). Judge Pryor has likewise cogently explained: “So long as the [religious organization’s] belief is sincerely held and undisputed — as it is here — we have no choice but to decide that compelling the participation of the [religious organization] is a substantial burden oh its religious exercise.” Eternal Word Television Network, Inc. v. Secretary, Department of Health & Human Services, 756 F.3d 1339, 1348 (11th Cir.2014) (Pryor, J., specially concurring).
In short, under Hobby Lobby, the regulations substantially burden plaintiffs’ exercise of religion.
The panel opinion concludes, however, that there is no substantial burden on plaintiffs’ exercise of religion. In particular, the panel opinion says that plaintiffs are wrong to think that they would be complicit in moral wrongdoing if they submit this form, as required by the Government. But to reiterate: Judicially second-guessing the correctness or reasonableness (as opposed to the sincerity) of plaintiffs’ religious beliefs is exactly what the Supreme Court in Hobby Lobby told us not to do. See Hobby Lobby, 134 S.Ct. at 2778. And Hobby Lobby was not the first Supreme Court case to say as much. See Thomas, 450 U.S. at 714-16, 101 S.Ct. 1425.
The panel opinion responds that plaintiffs are simply misunderstanding the law and that the law, properly understood, does not actually make plaintiffs complicit in providing contraceptive coverage. But there is no dispute that the Government is requiring plaintiffs to submit a form (to the Government or to the insurer) or else pay a penalty. And there is no dispute that the form is part of the process by *20 which the Government ensures that the religious organizations’ insurers provide contraceptive coverage to the organizations’ employees. In other words, the form matters and plays a role in this scheme. After all, if the form were meaningless, why would the Government require it? The Government is requiring plaintiffs to submit the form precisely because the form is part of the process by which the Government ensures that. the religious organizations’ insurers provide contraceptive coverage to the organizations’ employees.[5] Plaintiffs in turn sincerely believe that submitting the form under those circumstances makes them complicit in wrongdoing in contravention of their religious beliefs. See Plaintiffs’ Supplemental Br. 1. Compelling submission of the form therefore imposes a substantial burden under RFRA.[6]
The panel opinion separately notes that the Government intended the form to accommodate religious organizations so that the organizations themselves would not have to provide contraceptive coverage. But the panel opinion has been faked out by the Government’s accommodation. The accommodation provides an alternative, but the alternative itself imposes a substantial burden on the religious organizations’ exercise of religion. Again, this case arises in a “Do X or Y or pay a penalty” posture. All agree that X — providing, contraceptive coverage — infringes plaintiffs’ exercise of religion. But so does Y — submitting the form. What the panel opinion misses is that submitting this form is itself an act that contravenes the organizations’ sincere religious beliefs. It is no different from the recent Holt case, in which the act that contravened the Muslim prisoner’s sincere religious beliefs was shaving his beard. Submitting the form = shaving your beard. Or the Yoder case, in which the act that contravened the Amish parents’ beliefs was sending their children to high school. Submitting the form = sending your children to high school. Or the Lee case, in which the act that contravened the Amish employer’s religious beliefs was paying Social Security taxes. Submitting the form = paying the Social Security tax. Or the Sherbert case, in which the act that contravened the Seventh-day Adventist’s belief was working on Saturday, the Sabbath day of the faith. Submitting the form = working on the Sabbath.
In all of those cases, the Supreme Court recognized that the act in question repre *21 sented a sincere religious belief that the Government could not override except by employing the least restrictive means to further a compelling governmental interest. The same is true here. The panel opinion does not fully come to grips with that critical point, in my view.
The panel opinion therefore also does not appreciate that the substantial burden on plaintiffs’ exercise of religion comes from the monetary penalty (which in this case happens to be huge) that the organizations will have to pay if they adhere to their religious beliefs and do not submit the required form. In Holt, the substantial burden came from the discipline the prisoner would receive if he refused to shave his beard. In Yoder, it was the $5 monetary fíne for the parents whose children did not attend high school. In Lee, it was the monetary penalty for failure to pay taxes. In Sherbert, it was the denial of unemployment benefits for not working on the Sabbath.
The essential principle is crystal clear: When the Government forces someone to take an action contrary to his or her sincere religious belief (here, submitting the form) or else suffer a financial penalty (which here is huge), the Government has substantially burdened the individual’s exercise of religion. So it is in this case.
To be clear, that conclusion does not mean that plaintiffs prevail on their RFRA claim. Rather, it means only that they prevail on the first prong of the three-part RFRA inquiry and that we now must move on'to the second and third prongs. The Government may still be able to compel plaintiffs to submit the required form if the Government prevails on those second and third prongs. Cf. Lee, 455 U.S. at 257, 261, 102 S.Ct. 1051 (Government may force Amish employer to pay Social Security taxes notwithstanding substantial burden on Amish employer’s religion).
II
Second, does the Government have a compelling interest in facilitating women’s access to contraception — in particular, in facilitating access to contraception for the employees of these religious organizations? See 42 U.S.C. § 2000bb-1(b) (“Government may substantially burden a person’s exercise of religion only if it demonstrates that application of the burden to the person ... is in furtherance of a compelling governmental interest.”) (emphasis added); Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 430-31, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) (compelling interest test focuses on interest as applied to particular plaintiffs).
The plaintiff religious organizations strenuously argue that there is no such compelling governmental interest. As I see it, however, plaintiffs’ argument cannot be squared with the views expressed by a majority of the Justices in Hobby Lobby.
To begin with, how do we determine whether the Government has a “compelling interest” in overriding a -fundamental constitutional or statutory right such as RFRA’s right to religious freedom? Good question. No code or history book lists the Government’s compelling interests. Rather, courts have developed those interests over time, in common-law-like fashion.[7] What we do know, to put it in collo *22 quial and somewhat question-begging terms, is that the asserted governmental interest must be so critically important that it justifies overriding certain fundamental individual rights in certain circumstances. To quote the Supreme Court, the interest must be “of the highest order.” Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); see Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 2781, 189 L.Ed.2d 675 (2014). Examples of compelling interests from past Supreme Court cases include conducting the military draft, maintaining the tax system, running the Social Security program, and preventing discrimination against third parties. See Gillette v. United States, 401 U.S. 437, 461-63, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 699-700, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); United States v. Lee, 455 U.S. 252, 257-59, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); Bob Jones University v. United States, 461 U.S. 574, 603-04, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).[8]
In this case, we do not have to tackle the compelling interest question without guidance from above. Justice Kennedy strongly suggested in his Hobby Lobby concurring opinion — which appears to be controlling de facto if not also de jure on this particular issue — that the Government generally has a compelling interest in facilitating access to contraception for women employees. Hobby Lobby, 134 S.Ct. at 2785-86 (Kennedy, J., concurring); see also id. at 2779-80 (majority opinion); id. at 2799-2801 (Ginsburg, J., dissenting); cf. Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977). In particular, Justice Kennedy referred to the “premise” of the Court’s decision: namely, its “assumption” that the Government has a “legitimate and compelling interest” in facilitating access to contraception. Hobby Lobby, 134 S.Ct. at 2786 (Kennedy, J., concurring). Justice Kennedy’s use of the term “compelling” in this context was no doubt carefully considered. And the four dissenting Justices likewise stated that the Government had a compelling interest in facilitating women’s access to contraception. Id. at 2799-2801 (Ginsburg, J., dissenting).
It is not difficult to comprehend why a majority of the Justices in Hobby Lobby (Justice Kennedy plus the four dissenters) would suggest that the Government has a compelling interest in facilitating women’s access to contraception. About 50% of all pregnancies in the United States are unintended. The large number of unintended pregnancies causes significant social and economic costs. To alleviate those costs, the Federal Government has long sought to reduce thé number of unintended pregnancies, including through the Affordable Care Act by making contraceptives more cheaply and widely available. It is commonly accepted that reducing the number of unintended pregnancies would further women’s health, advance women’s personal and professional opportunities, reduce the *23 number of abortions,[9] and help break a cycle of poverty that persists when women who cannot afford or obtain contraception become pregnant unintentionally at a young age. In light of the numerous benefits that would follow from reducing the number of unintended pregnancies, it comes as no surprise that Justice Kennedy’s opinion expressly referred to a “compelling” governmental interest in facilitating women’s access to contraception.
In short, even if the Court did not formally hold as much, Hobby Lobby at least strongly suggests that the Government has a compelling interest in facilitating access to contraception for the employees of these religious organizations.[10]
Ill
Third, in light of those two conclusions, we must consider the least restrictive means issue. When, as here, a law substantially burdens the exercise of religion, but the law furthers a compelling governmental interest, RFRA requires the Government to use the “least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-1(b). The Supreme Court has emphasized that the “least-restrictive-means standard is exceptionally demanding.” Burwell v. Hobby Lobby Stores, Inc., — U.S. -, 134 S.Ct. 2751, 2780, 189 L.Ed.2d 675 (2014).
Congress adopted the least restrictive means requirement to help thread the needle between two conflicting principles. The least restrictive means requirement, properly applied, allows religious beliefs to be accommodated and the Government’s compelling interests to be achieved — a win-win resolution of these often contentious disputes. See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 436, 126 S.Ct. 1211, 163 L.Ed.2d 1017 (2006) (quoting 42 U.S.C. § 2000bb(a)(5)) (RFRA “ ‘is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.’ ”). As a leading First Amendment scholar has put it: “If there’s some way of granting an exemption and yet accomplishing the government’s goal, then there’s no real need to interfere with the religious practice, so the exemption must be granted.” Eugene Volokh, The First Amendment and Related Statutes 986 (5th ed.2014).
Requiring religious organizations to submit the form mandated by current federal regulations is not the Government’s least restrictive means of furthering its interest in facilitating access to contraception for the organizations’ employees. That is because the Government can still achieve its interest by allowing the religious organizations to submit the less restrictive notice that the Supreme Court has already twice indicated should be good enough to satisfy the Government’s interest.
In the Wheaton College and Little Sisters of the Poor cases, the Supreme Court carefully specified that the religious organizations would satisfy their current legal obligations' by submitting a simple notice to the Secretary of Health and Human Services “in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive ser *24 vices.” Wheaton College v. Burwell, — U.S. -, 134 S.Ct. 2806, 2807, 189 L.Ed.2d 856 (2014); see also Little Sisters of the Poor Home for the Aged v. Sebelius, - U.S. -, 134 S.Ct. 1022, 1022, 187 L.Ed.2d 867 (2014) (notice should be “in writing that they are non-profit organizations that hold themselves out as religious and have religious objections to providing coverage for contraceptive services”); cf. Eternal Word Television Network, Inc. v. Secretary, Department of Health & Human Services, 756 F.3d 1339, 1349 (11th Cir.2014) (Pryor, J., specially concurring) (“The United States, for example, could require the [religious organization] to provide a written notification of its religious objection to the Department of Health and Human Services.”).
By contrast to the form required by current federal regulations, the Wheaton College/Little Sisters of the Poor notice does not require the religious organizations to identify or notify their insurers, and thus (according to plaintiffs) lessens the religious organizations’ degree of complicity in what they consider to be wrongful as a matter of religious belief. See Plaintiffs’ Supplemental Br. 10. And even with the less detailed Wheaton College/Little Sisters of the Poor notice, the Government can independently determine the identity of the organizations’ insurers and thereby ensure that the insurers provide contraceptive coverage to the organizations’ employees. The Wheaton College/Little Sisters of the Poor notice may create some administrative inconvenience for the Government, because the Government itself will have to identify the religious organizations’ insurers. But administrative inconvenience alone does not negate the feasibility of an otherwise less restrictive means — unless the administrative problem would be “of such magnitude” that it would render “the entire statutory scheme unworkable.” Sherbert v. Verner, 374 U.S. 398, 408-09, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); see also Bowen v. Roy, 476 U.S. 693, 731, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) (O’Con-nor, J., concurring in part and dissenting in part) (“[A]dministrative inconvenience is not alone sufficient to justify a burden on free exercise unless it creates problems of substantial magnitude.”).
If a religious organization does not use the currently required form .but instead uses the Wheaton College/Little Sisters of the Poor notice, how would that affect third parties, namely the religious organizations’ employees? That question matters because the Supreme Court has stated that “courts must take adequate account of the burdens a requested accommodation may impose on nonbenefici-aries.” Cutter v. Wilkinson, 544 U.S. 709, 720, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (applying the related Religious Land Use and Institutionalized Persons Act). In Hobby Lobby, the Court reiterated that this consideration “will often inform the analysis of the Government’s compelling interest and the availability of a less restrictive means of advancing that interest.” Hobby Lobby, 134 S.Ct. at 2781 n. 37. As Justice Kennedy put it in his concurrence, the accommodation must not “unduly restrict other persons, such as employees, in protecting their own interests.” Id. at 2787 (Kennedy, J., concurring).
But here, the religious organizations’ employees would still receive the same insurance coverage from the same insurer for contraceptives. As the Supreme Court explained in its Wheaton College order: “Nothing in this interim order affects the ability of the applicant’s employees and students to obtain, without cost, the full range of FDA approved contraceptives” or “precludes the Government from relying on this notice, to the extent it considers it *25 necessary, to facilitate the provision of full contraceptive coverage under the Act.” Wheaton College, 134 S.Ct. at 2807. So accommodating the religious organizations by allowing them to use the Wheaton College/Little Sisters of the Poor notice would not, to use Justice Kennedy’s formulation, “unduly restrict” third parties. Cf. Douglas NeJaime & Reva B. Siegel, Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics, 124 Yale L.J., at 116 (forthcoming 2015) (version of Apr. 10, 2015) (“Wheaton College, like Hobby Lobby, appears to tie accommodation to the fact that the government has other ways of providing for the statute’s intended beneficiaries so that no third-party harm would result from the accommodation.”).
Although the Supreme Court’s Wheaton College and Little Sisters of the Poor orders were not final merits rulings, they at least qualify as extremely strong signals from the Supreme Court about how to resolve the least restrictive means issue in this case. In particular, the Court in Wheaton College granted an injunction under the All Writs Act, which is appropriate “only where the legal rights at issue are indisputably clear.” Wheaton College, 134 S.Ct. at 2808 (Sotomayor, J., dissenting) (internal quotation marks omitted). Moreover, the Court issued the Wheaton College order just days after its Hobby Lobby decision, and it did so over a detailed and forceful dissent.
In any event, regardless of whether we as a lower court are formally bound by the Supreme Court stay orders in Wheaton College arid Little Sisters of the Poor, the notice identified by the Supreme Court in those two cases is undoubtedly a less restrictive way for the Government to further its interest than the form required by current federal regulations. It necessarily follows that the form required by current regulations is not the “least restrictive means” available to the Government. As the Supreme Court said a few months ago in a similar context: If “a less restrictive means is available for the Government to achieve its goals, the Government must use it.” Holt v. Hobbs, — U.S. -, 135 S.Ct. 853, 864, 190 L.Ed.2d 747 (2015) (internal quotation marks omitted). So too here.
To be sure, some religious organizations claim that even the less restrictive Whea-ton College/Little Sisters of the Poor notice still imposes a substantial burden on their religious beliefs. But that obviously does not help the Government’s argument in support of the current, even more burdensome form. The key point here is that the Wheaton College/Little Sisters of the Poor notice is less restrictive (that is, less burdensome) than the currently required form and yet still furthers the Government’s compelling interest. Under RFRA, the Government therefore must employ that less restrictive means.[11]
Put simply, the Government need not — . and therefore under RFRA may not — pursue its compelling interest in facilitating access to contraception by requiring religious non-profit organizations to submit *26 the form required by current federal regulations.[12]
One final note for clarity: The Government may of course continue to require the religious organizations’ insurers to provide contraceptive coverage to the religious organizations’ employees, even if the religious organizations object. As Judge Flaum correctly explained, “RFRA does not authorize religious organizations to dictate the independent actions of third-parties, even if the organization sincerely disagrees with them.” University of Notre Dame v. Sebelius, 743 F.3d 547, 567 (7th Cir.2014) (Flaum, J., dissenting), vacated and remanded, — U.S. -, 135 S.Ct. 1528, 191 L.Ed.2d 557 (2015). “That is true whether the third-party is the government, an insurer, a student, or some other actor.” Id. “So long as the government does not require” religious organizations themselves “to take action, RFRA does not give” the religious organizations “a right to prevent the government from providing contraceptives to” the religious organizations’ employees. Id.
In sum, I respectfully would grant rehearing en banc and rule for the plaintiff religious organizations on the ground that the Wheaton College/Little Sisters of the Poor notice is a less restrictive way than the currently mandated form for the Government to achieve its compelling interest in facilitating access to contraception for the organizations’ employees.

. The form submitted to a religious organization's insurer must certify that the organization (1) opposes providing coverage for some or all of the contraceptive services required by the contraceptive mandate on account of religious objections; (2) is organized and operates as a non-profit entity; and (3) holds itself out as a religious organization. See 29 C.F.R. § 2590.715-2713A(a), (b)(1)(h), (c)(1); 45 C.F.R. § 147.131(b), (c)(1). In certain circumstances, the form must also "include notice” of the insurer's obligations to provide contraceptive coverage to the religious organization's employees. 29 C.F.R. § 2590.715-2713A(b)(l)(ii)(A).
The letter to the Secretary of Health and Human Services must include the following information: (1) the name of the religious non-profit organization; (2) the basis on which it qualifies for an accommodation; (3) its objection based on sincerely held religious beliefs to providing coverage for some or all contraceptive services, including notice of the subset of contraceptive services to which it objects; (4) its insurance plan’s name and type; and (5) the name and contact information for any of the insurance plan’s third party administrators and health insurance issuers. See 29 C.F.R. § 2590.715-2713A(b)(l)(ii)(B), (c)(l)(ii); 45 C.F.R. § I47.131(c)(l)(ii); Coverage of Certain Preventative Services Under the Affordable Care Act, 79 Fed.Reg. 51,092, 51,094-95 (Aug. 27, 2014).

. The relevant section of RFRA provides in full: “Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.” 42 U.S.C. § 2000bb-l(b).

. The Supreme Court has determined that denying benefits to (and not just imposing penalties on) someone engaged in conduct mandated by religious belief imposes a substantial burden on the exercise of religion. In denial-of-benefits cases, “[w]hile the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.” Thomas, 450 U.S. at 718, 101 S.Ct. 1425. Congress incorporated that broad understanding of substantial burden into RFRA. Of course, the question of indirect burdens from the denial of government benefits is not at issue in this case. Here, we have the classic direct monetary penalty compelling conduct that contravenes religious belief. There has never been a question that such a direct penalty imposes a substantial burden on the exercise of religion. See Hobby Lobby, 134 S.Ct. at 2775-76, 2779; Yoder, 406 U.S. at 208, 218, 92 S.Ct. 1526; Sherbert, 374 U.S. at 404, 83 S.Ct. 1790. Put simply, it is black-letter law that a "substantial burden” on the exercise of religion occurs when, as here, the government "compel[s] someone to do something that violates his religious beliefs, or prohibit[s] someone from doing something that is mandated by his religious beliefs.” Eugene Volokh, The First Amendment and Related Statutes 1060 (5th ed.2014).

. In that regard, it is important to note at least three limits on a claimant’s ability to *18 prevail under RFRA.
First, RFRA does not provide protection to philosophical, policy, political, or personal beliefs, for example. It protects only religious beliefs. 42 U.S.C. § 2000bb-l(a) ("Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.”) (emphasis added).
Second, RFRA does not cover insincere religious beliefs — that is, beliefs that are not truly held — such as when someone asserts a personal objection dressed up as a religious objection. Under RFRA, the courts must police sincerity. As the Supreme Court has explained, RFRA reflects Congress's confidence in "the ability of the federal courts to weed out insincere claims.” Hobby Lobby, 134 S.Ct. at 2774. And the Hobby Lobby Court approvingly cited a number of cases where courts have inquired into the sincerity of religious claims. Id. at 2774 nn. 28-29 (citing United States v. Quaintance, 608 F.3d 717, 718-19 (10th Cir.2010); Abate v. Walton, 77 F.3d 488, 1996 WL 5320, at *5 (9th Cir. Jan. 5, 1996); Ochs v. Thalacker, 90 F.3d 293, 296 (8th Cir.1996); Green v. White, 525 F.Supp. 81, 83-84 (E.D.Mo.1981); Winters v. State, 549 N.W.2d 819, 819-20 (Iowa 1996)). As the Supreme Court has previously stated: “[W]hile the truth of a belief is not open to question, there remains the significant question whether it is truly held. This is the threshold question of sincerity which must be resolved in every case.” United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (internal quotation marks omitted). In short, in these religious freedom cases, the courts appropriately "inquir[e] into the sincerity” of a claimant’s "professed religiosity.” Cutter v. Wilkinson, 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (applying the related Religious Land Use and Institutionalized Persons Act).
Third, as explained more fully below, RFRA’s compelling interest standard allows the Government to compel or proscribe action in certain circumstances even though, by doing so, the Government may be substantially burdening someone’s religion.

. If the form were meaningless, the Government presumably would not require it and perpetuate this rancorous dispute with religious organizations around the country.

. The panel’s concurrence in the denial of rehearing en banc largely echoes Justice Soto-mayor’s dissent in Wheaton College. Compare Panel Concurrence at 4 ("In no respect do we, nor could we, question Plaintiffs' sincere beliefs about what their faith permits and forbids of them. But we can and must decide which party is right about how the law works.”), with Wheaton College, 134 S.Ct. at 2812 (Sotomayor, J., dissenting) ("Wheaton is mistaken — not as a matter of religious faith, in which it is undoubtedly sincere, but as a matter of law.... Any provision of contraceptive coverage by Wheaton’s third-party administrator would not result from any action by Wheaton; rather, in every meaningful sense, it would result from the relevant law and regulations.”). But the Supreme Court, by a 6-3 margin, did not agree with Justice Sotomayor's dissent in Wheaton College, at least for purposes of the injunction. The Court instead granted an injunction under the All Writs Act to Wheaton College, which the Court could do only if it concluded that the required form "indisputably” would impose a substantial burden on Wheaton College’s exercise of religion. See Turner Broadcasting System, Inc. v. Federal Communications Commission, 507 U.S. 1301, 1303, 113 S.Ct. 1806, 123 L.Ed.2d 642 (1993) (Rehnquist, C.J., in chambers) (internal quotation marks omitted); Wheaton College, 134 S.Ct. at 2808 (So-tomayor, J., dissenting) (internal quotation marks omitted).

. The compelling interest nomenclature took root somewhat ignominiously in free speech cases as a way to justify the Government's suppression of Communist speech. See, e.g., Konigsberg v. State Bar of California, 366 U.S. 36, 49-52, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Barenblatt v. United States, 360 U.S. 109, 126-27, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Sweezy v. New Hampshire, 354 U.S. 234, 265-67, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in result). In any event, the compelling interest override is now *22 an established part of various constitutional doctrines, including the First and Fourteenth Amendments. And Congress expressly incorporated it into the Religious Freedom Restoration Act.

. As noted above, at least three aspects of RFRA limit the statute’s reach and thus help answer the parade of horribles sometimes raised in opposition to religious freedom claims. First, RFRA covers only religious objections. Second, insincere religious claims are excluded from RFRA’s protection. Third, RFRA’s compelling interest standard allows the Government to compel or proscribe action in certain circumstances even though, by doing so, the Government may be substantially burdening someone’s religion.

. As the panel opinion in this case accurately pointed out, as of now about 40% of all unintended pregnancies end in abortion.

. Justice Kennedy's Hobby Lobby opinion did not expressly discuss whether a compelling governmental interest in ensuring gener-ai coverage for contraceptives encompasses ensuring coverage for those specific drugs and services that, some believe, operate as abortifacients and result in the destruction of embryos.

. The Wheaton College/Little Sisters of the Poor notice requires a religious organization to, in effect, raise its hand to opt out. But contrary to what the panel’s concurrence in the denial of rehearing en banc says, see Panel Concurrence at 3 n. 1, the currently required form requires a religious organization both to raise its hand and to point to its insurer. From the perspective of the plaintiff religious organizations, the currently required form is therefore more burdensome because it makes the organizations identify or notify their insurers, which the organizations believe makes them more complicit in the provision of contraceptive coverage to which they object as a matter of religious belief.

. As the Court in Hobby Lobby noted, the Government could directly subsidize or provide contraceptives to employees of religious non-profit organizations. See Hobby Lobby, 134 S.Ct. at 2780-81. The direct funding option raises certain feasibility issues. A means that is not a reasonably feasible way of furthering the Government’s interest cannot be deemed a less restrictive means of furthering that interest. In Little Sisters of the Poor, Hobby Lobby, and Wheaton College, the Court did not say that direct funding was the least restrictive means of furthering the Government’s interest. If it had, then even the Wheaton College/Little Sisters of the Poor notice would itself be too restrictive. In any event, what matters in the present case is that the Wheaton College/Little Sisters of the Poor notice is less restrictive than the form required by the current federal regulations but still achieves the Government's interest.